The STATE of Texas,

v.

Allen Brian VELASQUEZ, Appellee.

Nos. 1099–98, 1100–98.

Court of Criminal Appeals of Texas.

June 16, 1999.

Candelario Elizondo, Houston, for appellant.

Rikke Burke Graber, Asst. Dist. Atty., Houston, Jeffrey L. Van Horn, First Asst. State's Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

KEASLER, J. delivered the opinion of the Court.

Early one August morning in 1996, Allen Brian Velasquez boarded a bus in Houston. Within minutes, police officer Bill Corley also boarded the bus and initiated a conversation with him. Officer Corley asked permission to search the bag on the seat next to Velasquez. Velasquez denied ownership of the bag and did not object. The search revealed cocaine and marihuana. We are asked to decide whether the search was lawful. We conclude that it was.

## THE FACTS

The trial judge entered written findings of fact and conclusions of law at the hearing on Velasquez's motion to suppress the cocaine and marihuana. He found that "Officer Corley is a credible witness, and the Court accepts as true his testimony regarding his observations of the defendant and his conversations with the defendant." So we will rely on Officer Corley's testimony in reviewing the facts.

Corley, a twenty-seven year veteran police officer, was assigned to the narcotics division. He was on duty at the Greyhound Bus Station near downtown Houston when Velasquez attracted his attention. He saw Velasquez getting out of a truck, carrying a black "duffle-type" bag over his shoulder. Corley testified that Velasquez's actions were consistent with those of drug couriers. He was dropped off across the street from the terminal, rather than immediately in front. After buying his ticket, he sat in a waiting area on the opposite side from his departure gate. From the time he walked in the door, he constantly looked around, scanning the terminal lobby. Although he arrived early, Velasquez waited until immediately before departure time to board the bus.

When Velasquez boarded the bus, Corley saw Officer Armando Ordaz and told him his suspicions. The two officers approached the bus driver, and told him that they wanted to board the bus "for a couple of minutes." The driver said to go ahead and that he wasn't leaving for a few minutes, anyway.

When the two officers boarded the bus, Velasquez was already seated in an aisle seat toward the middle of the bus. The

black bag was on the seat next to him. Officer Ordaz took a seat a couple of rows in front of Velasquez. Officer Corley walked on past Velasquez, toward the rear of the bus. Neither officer was in uniform.

Corley turned around and stopped in the aisle immediately behind Velasquez. He squatted down, leaned over and identified himself as a police officer to Velasquez. Neither officer was blocking the aisle to prevent Velasquez's departure. And Velasquez had no reason to suspect that Ordaz was a police officer.

Corley then asked Velasquez if he could talk to him. Velasquez replied, "Sure." Corley asked his destination, asked to see his ticket, and asked him for identification. Velasquez complied with each request.

After a few insignificant questions, Officer Corley asked Velasquez if he had any luggage. Velasquez replied that he did not. Corley asked him if the bag next to him was his. Velasquez responded, "No, that's not my bag."

Corley reached over to pick up the bag. Velasquez placed his hands across the bag and asked, "What are you doing?"

Corley said, "I'm getting this bag. Is it your bag?"

Velasquez replied, "Uh, no, it's not."

Upon looking in the bag, Corley found a ziploc bag containing marihuana. He then placed Velasquez under arrest, summoned Officer Ordaz, handed him the bag, and the three left the bus. The cocaine was found when the bag was thoroughly searched.

## THE PROCEDURAL HISTORY

After hearing these facts, the trial judge granted Velasquez's motion and suppressed all evidence of the marihuana and cocaine. In addition to finding Officer Corley credible, the trial judge found

"[t]hat the defendant engaged in a consensual conversation with Officer Corley while on the bus."

In his conclusions of law, the trial judge found:

1. That the black bag ... was abandoned as a result of police activity.

2. That Officer Corley did not have probable cause to approach the defendant and engage him in conversation or to detain the bus to conduct his investigation.

3. That the defendant was arrested after Officer Corley found marihuana in the black bag.

A panel of the First Court of Appeals affirmed the trial court's ruling with Justice Nucia dissenting.

## ANALYSIS

■ The trial court speaks of no "probable cause to approach the defendant and engage him in conversation or to detain the bus ..." But the issue of probable cause arises in searches, seizures, and arrests. It does not apply to a police officer's approaching a citizen to engage in conversation. Nor does the issue of articulable suspicion to detain under *Terry v. Ohio*[1] apply here. According to the trial court's findings of fact, this is "a consensual conversation" between Velasquez and Officer Corley. So it is not an arrest or a detention. It is an encounter.

■ In *Hunter v. State*[2] we said that "[a] police officer is just as free as any other citizen to stop and ask questions of a fellow citizen." We cited *Florida v. Bostick*[3] as holding that such encounters are consensual "[s]o long as a reasonable person would feel free to disregard the police and go about his business." But that is not what *Bostick* held. In that case, as in ours, the encounter between the police and the suspect took place on a bus. The

1. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. 955 S.W.2d 102 (1997).

3. 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

Supreme Court realized that the "freedom to leave and go about one's business" test was inappropriate under these facts. Instead, the issue is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. [The test] applies to encounters that take place on a city street or in an airport lobby, and it applies equally to encounters on a bus." [4] We will follow this rule and apply it to the facts at hand.

■ This case and *Bostick* are similar. In both cases, officers initiated a conversation with a suspect on a bus without articulable suspicion. They asked to inspect his ticket and identification. They were looking for drugs. They asked the suspect's permission to search his luggage. They searched the luggage and found drugs.

The officers in *Bostick* advised the suspect that he had the right to refuse consent to search. On the other hand, Officer Corley gave Velasquez no such warning. But this is only one factor in determining whether the encounter constitutes a seizure. In *Bostick,* two officers, one of whom was obviously armed, questioned the suspect. In contrast, only Officer Corley questioned Velasquez, and there was no evidence as to weapons. We agree with the trial court that under all the circumstances surrounding the encounter, the conversation between Officer Corley and Velasquez was consensual.

Of course "consensual" is a relative term. We doubt that Velasquez was overjoyed to be questioned by a police officer——especially in light of his bag's contents. And even an innocent passenger's pulse might race when a police officer identifies himself and begins asking questions. He might understandably be uncomfortable saying, "Officer, I don't want to talk to you. Please leave me alone." But the Constitution does not guarantee freedom from discomfort. And the test is not whether a timid person would feel free to terminate the interview. Instead, the Supreme Court uses a "reasonable person" standard.

The Court of Appeals apparently says that the consensual encounter between Corley and Velasquez became involuntary at some point. But there was no such finding by the trial court. The Court of Appeals' finding that the bus door was closed, thus trapping Velasquez on board, was not supported by the trial court's findings. Indeed, the trial court found that Corley was credible and that his statements were true. Corley said the door was left open. In any event, we find no evidence that the encounter, initially consensual, became coercive.

■ Having determined that the encounter was consensual, we now examine the search of the bag. In his conclusions of law, the trial judge says that "the black bag . . . was abandoned as a result of police activity." But many legally obtained, admissible items are abandoned as a result of police activity. In *McDuff v. State* [5] we said that a person abandons property if his "decision to abandon it was not the result of police misconduct." [6] There is no evidence of police misconduct here. And Velasquez at least twice denied ownership of the bag and voiced no objection to the search.

## CONCLUSION

We hold that Velasquez abandoned the bag. The cocaine and marihuana discovered in the bag were properly admissible against him at trial. Therefore, we reverse the Court of Appeals' judgment and the trial court's order granting Velasquez's suppression motion. We remand this case to the trial court for further proceedings consistent with this opinion.

MEYERS, J. delivered a dissenting opinion.

---

**4.** *Id.* at 440.

**5.** 939 S.W.2d 607 (1997).

**6.** *Id.* at 616.

MEYERS, J., delivered this dissenting opinion.

"[T]he Court of Criminal Appeals may, on its own motion, review a decision of a Court of Appeals in a criminal case as provided by law." TEX. CONST. art. 5, § 5. The Code of Criminal Procedure likewise provides that this Court "may, on its own motion, with or without a petition for such discretionary review being filed by one of the parties, review any decision of a court of appeals in a criminal case." TEX.CODE CRIM. PROC. art. 4.04 § 2. These are the only provisions in our law precisely describing this Court's discretionary review jurisdiction.

This Court has interpreted "review a decision of a Court of Appeals" to mean that we may *re-do* a decision of a court of appeals. *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App.1997). In other words, we are "free to simply disagree with the intermediate court's resolution and thus [may] substitute [our own] conclusion for that of the court of appeals" and this action "does not exceed [our] constitutional and statutory authority to 'review' decisions of the courts of appeals." George E. Dix and Robert O. Dawson, 43 Texas Practice, Criminal Practice and Procedure § 44.11 at 202 (West Supp.1999)(discussing and interpreting Court's holding in *Guzman*). The trouble with this approach, as illustrated perfectly in the instant case, is that any meaningful distinction between the role of this Court and that of the court of appeals, becomes obscured—acting as just another appellate court, we conduct *the exact same* function as that engaged in by the court of appeals. Even worse, we do so inconsistently. Sometimes we elect to conduct such analysis and sometimes we choose to remand to the court of appeals. *Compare id. and Quinn v. State*, 958 S.W.2d 395 (Tex.Crim.App.1997)(conducting *de novo* review) *with Loesch v. State*, 958 S.W.2d 830 (Tex.Crim.App.1997)(remanding for court of appeals to redo *de novo* review) *and Loserth v. State*, 963 S.W.2d 770 (Tex.Crim.App.1998)(remand-

ing for court of appeals to redo *de novo* review). When we conduct a function that is not discernibly different from that exercised by the court of appeals (except in the conclusions reached) and we elect to so act on a case by case basis with no articulated guidelines governing when such action is appropriate, we (to borrow a phrase utilized by fellow jurists in a different context) ultimately engage in what might be viewed as "result-oriented, lawless decision-making." *Rankin v. State*, 974 S.W.2d 707, 716 (Tex.Crim.App.1996)(McCormick, P.J., joined by White and Keller, J.J., dissenting).

Other judges have expressed similar concerns in similar contexts:

After an entire decade of multi-tiered appellate review in criminal cases, it is nothing short of astonishing that the court of last resort in such matters can still not come to grips with its own place in the "new" system. During the past ten years, we have remanded to the Court of Appeals for a harm analysis in nearly ten per cent of all cases on discretionary review decided by published opinion. Of course, there have also been a number of cases, far fewer to be sure, in which the harm analysis, as here, was done for the first time in this Court. *What is so embarrassing is not that we have sometimes handled cases differently, but that we have done so capriciously. The long and the short of it is that similarly situated litigants are being treated inconsistently by this Court without any principled basis or rational explanation. Surely it is not too much to expect that a tribunal with the stature of this one develop some protocol for the conduct of its business, if for no other reason to avoid looking foolish or arbitrary.*

There is no cogent reason under the existing system to expect that an ultimate decision about the viability of any given criminal conviction will be made by this Court on discretionary review,

since there is nothing in the law to suggest that we have any such authority. Rather, it is the various courts of appeals that are charged with providing the appellate review to which the laws of this State entitle persons who have been convicted of crimes. *Our job is to scrutinize those decisions sparingly for deficiencies of analysis in order to see whether the criminal jurisprudence of Texas is working as it should.* And the criteria for success of the system is not whether we would have done the same as an appellate court any more than it is whether we would have done the same as a jury. When the person or tribunal who is charged under the law with performing a task has performed it as the law prescribes, it is our duty to leave it undisturbed, even if we would not have performed it the same way. And for like reason, it is our duty to forbear from preemptively executing the task assigned to another by law ...

*Gipson v. State,* 844 S.W.2d 738, 743–44 (Tex.Crim.App.1992) (Benavides, J., concurring, joined by McCormick, P.J., Campbell and White, J.J.) (emphasis added). That the Court is not particularly concerned with the potentially deficient *analysis* of the Court of Appeals' could not be more apparent than in its opinion today. So uninterested, is the majority, in the Court of Appeals' analysis, that it is mentioned in just two sentences. *Majority*

*opinion* at 678–79. The majority says one of the facts discussed in the Court of Appeals' opinion is not supported by the record.[1] The majority does not point specifically to any other problem in the Court of Appeals' opinion.

While I don't find the majority's application of law to fact unreasonable, neither do I find the Court of Appeals' analysis unreasonable. That court applied the correct law to the pertinent facts. Therefore, I would hold this case improvidently granted. The majority's treatment of this case leaves me missing *Arcila v. State,* 834 S.W.2d 357, 360 (Tex.Crim.App.1992), and its principled articulation of this Court's role as "the caretaker of Texas law, not the arbiter of individual applications." The majority's post-*Guzman,* anti-*Arcila* posturing demonstrates little respect for the integrity of our courts of appeals, and little sense of our role as a court of discretionary review.[2]

Finally, it strikes me as ironic that here, the majority has spent precious judicial resources writing a 7 page opinion that differs from the Court of Appeals' opinion only with regard to the *application of law to fact,* but when faced with the opportunity to write on a difficult *legal issue* that was allegedly handled incorrectly by the Court of Appeals, the majority adopted wholesale the Court of Appeals' analysis with no explanation as to why that analysis

1. The majority says "the Court of Appeals' finding that the bus door was closed, thus trapping Velasquez on board, was not supported by the trial court's findings.... Corley said the door was left open." *Majority opinion* at 6. But Corley's testimony was not exactly crystal clear on this point. It seems the door was not closed behind the officers immediately after boarding, but once further down the aisle, Corley could not say whether the door closed or remained open:

   [Defense counsel]: In fact, the door to the bus was closed; wasn't it?
   [Officer Corley]: No.
   Q: Well, you just told us a little while ago you weren't watching the front of the bus?
   A: Well, it wasn't closed as we went in. I don't know if you—after we got down in-

side, you can't see. From where we were at, you can't see the front door because you have to go around and go down some steps. But the bus driver didn't close it after we got in.
   Q: Do you know that for a fact?
   A: Yes, sir. *He didn't close it, not until maybe after I got in the back.* But at—
   Q: Okay. So you don't know if he closed the door after you entered the bus or not?
   A: No, *it was open when we started off, so I never saw it closed.*

2. In *Arcila,* we explicitly established "a general rule of restraint, insofar as our discretionary review function is concerned, which will largely leave business of basic appellate review to the intermediate courts." *Arcila,* 834 S.W.2d at 360 n. 2.

was not susceptible to the claims made in the petition for discretionary review. *Zubia v. State,* No. 0926–98 slip op., 1999 WL 371546 (Tex.Crim.App. June 9, 1999).

With these remarks, I dissent.