Affirmed and Memorandum Opinion filed August 9, 2007








Affirmed and Memorandum Opinion filed August 9, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-00231-CR

_______________

 

BRANDI MARQUETTE ELDRED, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                                                               


On Appeal from the 228th  District
Court

 Harris County, Texas

Trial Court Cause No. 980689

                                                                                                                                               


 

M E M O R A N D U M  O P I N I O N

After
the trial court denied her pretrial motion to suppress, appellant, Brandi
Marquette Eldred, pleaded guilty to possession of a controlled substance with
intent to deliver. The trial court sentenced appellant to fifteen years= confinement and assessed a $1,000
fine.  In five issues, appellant contends the trial court erred by denying her
motion to suppress evidence seized because she was illegally detained in
violation of the Fourth Amendment, and her consent to the search was
involuntary.  Our disposition is based on clearly settled law.  Accordingly, we
issue this memorandum opinion and affirm.  See Tex. R. App. P. 47.4.








I.  Background 

On March
12, 2004, after receiving a tip that someone named ABrandi@ was engaged in methamphetamine
distribution, special agents with the Drug Enforcement Administration (DEA)
conducted surveillance on a house in Humble. Special Agents Mark Terry, Brad
Sowell, Nathan Jones, and Jackie Gordon were involved in the surveillance
operation. 

Mark
Terry, the agent in charge, testified at the suppression hearing as follows.
The operation began around 1:00 p.m.  Within ten minutes, agents observed a white
male exit through the front door of the house and place a dark backpack in a
Sebring automobile.  After talking on his cell phone, the man reentered the
house. A few minutes later, he again exited through the front door of the
house, placed something on the passenger-side floorboard of the Sebring, then
re-entered the house.  At approximately 2:00 p.m., he left the house again and
drove away in the Sebring.  Agent Terry alerted a Harris County deputy to
follow and look for an opportunity to make a stop, based on a traffic law
violation.  

A few
minutes later, two people in a black Dodge Neon arrived at the surveillance
location.  They went into the house for about twenty minutes.  When they drove
away, Agent Terry notified a Harris County deputy to follow and look for an
opportunity to make a traffic stop.  Thereafter, he  followed the Neon until a
deputy made the stop.  Agent Terry testified that he did not recognize the
driver; however, he recognized passenger Robert Morgan because he was familiar
with his reputation.  The driver of the Neon was arrested for possession of
Xanax without a prescription.  The Sebring was stopped around the same time. 
Agent Terry was informed that the driver was arrested for possession of a gun. 









Based on
the results of these traffic stops, Agent Terry asked Agents Jones and Gordon
to return to the house and continue surveillance because he was concerned
Morgan might call the occupants and inform them that he had been stopped.  When
Agent Terry returned to the house, Agents Jones and Gordon were speaking with
appellant.  Appellant was sitting in the driver=s seat of her car which was parked in
the driveway.  Agent Jones, who had already asked appellant for identification,
handed appellant=s driver=s license to Agent Terry.  Agent Terry noticed that the name
on  the license was ABrandi.@  Early in the conversation, appellant informed the agents
that she was the housekeeper.  Agent Terry asked appellant if she had a key to
the house, and she said, Ano.@  She seemed very Aflighty and nervous.@ Agent Terry asked appellant for her
keys.  After appellant produced her keys, Agent Terry went to the front door
and determined that one of appellant=s keys matched the front door lock. 
At this point, Agent Terry did not open the front door.  Agent Terry returned
to appellant=s car and asked her to accompany him to the front door.  He then showed
her that one of her keys fit the front door lock.  

Apparently,
a few people in the neighborhood were watching all of this activity.  Agent
Gordon asked appellant if she would like to go inside the house, and she said, Ayes.@ Inside the house, Agent Gordon asked
appellant if the agents could search the house.  Appellant initially told them
that she did not have the right to consent because someone else lived there,
and she was not named on the lease.  Heidi Baker was the owner of the house. 
When Baker  arrived, Agent Jones met her outside the house.  Agent Jones
informed Agent Terry that Baker was outside.  Agent Terry spoke with Baker
outside the house.  She informed Agent Terry that appellant lived in the house,
but her name was not on the lease.  Baker entered the house and spoke with
appellant.  Appellant then signed a consent-to-search form and orally consented
to a search of her bedroom, her daughter=s bedroom, and the common areas on
the condition that  Baker would be present when they searched her room.[1] 
Methamphetamine was found in appellant=s bedroom, and she was arrested. 

Appellant=s pretrial motion to suppress the
evidence seized was denied, and she pleaded Aguilty@ to possession of a controlled
substance with intent to deliver.        








II.  Standard of Review 

In reviewing a trial court=s ruling on a
motion to suppress, we apply a bifurcated standard, giving almost total
deference to the trial court=s determination of historical facts
supported by the record and considering de novo the trial court=s application of
the law of search and seizure.  Carmouche v. State, 10 S.W.3d 323, 327 (Tex.
Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 88B89 (Tex. Crim.
App. 1997); see Marsh v. State, 140 S.W.3d 901, 905 (Tex. App.CHouston [14th
Dist.] 2004, pet. ref=d).  In a motion-to- suppress hearing, the
court is the trier of fact and sole judge of the credibility of witnesses and
the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853,
855 (Tex. Crim. App. 2000); Marsh, 140 S.W.3d at 905.  The trial court
is free to believe or disbelieve all or any part of a witness=s testimony, even
if the testimony is uncontroverted.  Ross, 32 S.W.3d at 855; Marsh,
140 S.W.3d at 905.  When,
as in this case, the trial court does not make explicit findings of fact in
ruling on a motion to suppress, we review the evidence in the light most
favorable to the trial court=s ruling and assume that the court made implicit findings
supported by the record.  Carmouche, 10 S.W.3d at 327B28; Ross, 32 S.W.3d at 855. 

III.   Analysis

A.        Consensual Encounter

In her
first and second issues, appellant contends she was detained in violation of
the Fourth Amendment.  In response, the State contends the entire interaction
was a consensual encounter.  For all the reasons outlined below, we agree with
the State. 








Not all
encounters between the police and citizens invoke the protection of the Fourth
Amendment.  See Terry v. Ohio, 392 U.S. 1, 13 (1968).  Police are free
as anyone else to ask questions of their fellow citizens.  Hunter v. State,
955 S.W.2d 102, 104 (Tex. Crim. App. 1997).  For purposes of the Fourth
Amendment, interactions between police officers and civilians are divided into
three categories: (1) consensual encounters, (2) investigative detentions, and
(3) arrests.  See Florida v. Royer, 460 U.S. 491, 497B99 (1983); Pennywell v. State,
127 S.W.3d 149, 152 (Tex. App.CHouston [1st Dist.] 2003, no pet.).  An encounter occurs when
a law enforcement officer approaches an individual in public to ask questions.[2] 
Pennywell, 127 S.W.3d at 152.  The officer is not required to justify
initiating an encounter because no constitutional protections are implicated.  Id. 
Therefore, the officer does not need reasonable suspicion or probable cause to
initiate an encounter.  See State v. Velesquez, 994 S.W.2d 676, 678
(Tex. Crim. App. 1999).  Merely asking questions does not transform an
encounter into a detention.  Id.  The test for whether the interaction
progressed beyond an encounter and became a detention is whether the police
conduct would have communicated to a reasonable person that she was not free to
decline the officers= requests or otherwise terminate the encounter.  Velasquez,
994 S.W.2d at 679.

Appellant
contends that the agents engaged in an investigative detention because they 
(1) stopped her from leaving, (2) took her driver=s license, (3) instructed her to
remain in her car until Agent Terry arrived, (4) took her keys away from her, and
(5) behaved in an authoritative manner.  However, her descriptions of the
officers= activities do not accurately reflect
the entire record. 

Agents
Jones and Gordon first approached appellant in her driveway after she entered
her car.  They identified themselves to appellant as DEA agents.  Agent Terry
testified that no cars blocked appellant from exiting the driveway.  Further,
Agent Jones testified that he requested appellant to remain until Agent Terry
arrived.  He also testified that he asked appellant for her identification and
inquired regarding her connection with the house.  In response, she gave him
her driver=s license and said that she was a housekeeper.  During this time,
appellant never asked to leave.  She only informed the agents that she was on
her way to pick up her child from school.  








Agent
Terry arrived shortly thereafter.  He asked appellant if she had a key to the
house.  Because appellant=s name matched information provided by the tipster and she
appeared Aflighty and nervous,@ Agent Terry asked her if he could see her keys.  Appellant
readily  handed her keys to Agent Terry.  After checking and confirming that
one of the keys could actually unlock the front door, he asked appellant to
accompany him to the front door. Appellant implicitly agreed to accompany Agent
Terry to the front door. 

Once
Agent Terry demonstrated to appellant that one of her keys matched the front
door, appellant then told the agents that she stayed in the home occasionally
and had paid the last month=s rent.  Agent Gordon asked appellant if she would like to go
inside the house to avoid curious neighbors.  Appellant agreed.  After they
entered, the agents asked appellant if she would consent to a search of the
house. 

We
further note that during the entire encounter all three agents wore plain
clothes and had concealed their weapons.  We acknowledge that the presence of
three agents could be intimidating; however, Agent Jones testified that he
remained outside while Agents Gordon and Terry spoke with appellant inside the
house.  Moreover, the Court of Criminal Appeals has recognized that even an
innocent person=s pulse might race when a police officer  identifies himself
and begins asking questions.  Velasquez, 994 S.W.2d at 679.  A person Amight understandably be uncomfortable
saying, >Officer, I don=t want to talk to you.  Please leave
me alone.=@ Id.  However, the United States Constitution does not
guarantee freedom from discomfort.  Id.  Furthermore, the request for
appellant=s consent to search did not strip the encounter of its consensual
character.  See Hunter, 955 S.W.2d at 106 (recognizing that a police
officer=s asking questions and requesting
consent to search do not alone render an encounter a detention).  








In a
footnote in her brief, appellant argues that Ataking of the keys@ was an illegal seizure because she Aacquiesced to the show of authority.@  Appellant cites Hawkins v. State, 
in which an officer walked over to the defendant and held out his hand, and the
defendant took cocaine out of his mouth and placed it in the officer=s hand. 853 S.W.2d 598, 602 (Tex.
App.CAmarillo 1993, no pet.).  The court
held that the evidence was insufficient to establish voluntary consent to
search because it was an acquiescence to a claim of lawful authority based on
an illegal detention.  Id.  Hawkins does not apply to this case because
the Ataking@ of the cocaine was not used to
establish detention.  

In
another footnote, appellant also insinuates that the agents took her driver=s license and retained it for the
duration of the encounter, which she contends was an illegal seizure.  The
record is not clear exactly when the driver=s license was returned to appellant. 
Agent Jones testified that he requested appellant=s identification when they first
approached her in the driveway.  Agent Terry testified that he inspected her
driver=s license when he joined the other
two agents in the driveway.  Agent Gordon testified that appellant=s driver=s license was returned at some point,
but she was not sure of the exact time.  Because the record is not clear
relative to the amount of time the agents retained appellant=s driver=s license, the evidence does not
support appellant=s contention that the driver=s license was retained for the
duration of the encounter.

 

Under 
the described circumstances, the police conduct would have communicated to a
reasonable person that she was free to decline the officer=s requests or otherwise terminate the
encounter.  See Velasquez, 994 S.W.2d at 679  (finding consensual
encounter where two police officers observed defendant at bus station with
actions consistent with drug couriers and one officer questioned the defendant
on a bus after identifying himself as a police officer);  Hunter, 955
S.W.2d at 106 (finding consensual encounter where two undercover officers in
plain clothes with their weapons concealed approached the defendant and one of
the two officers engaged him in conversation).  

Accordingly,
we overrule appellant=s first and second issues.  

 

 








B.        Consent to Search 

In her
third, fourth, and fifth issues, appellant contends  her consent to the search
was involuntary; therefore, agents violated the Fourth Amendment to the United
States Constitution and Article 1, section 9 of the Texas Constitution. 
Specifically, appellant contends her signature on the consent-to-search form
was  involuntary for two reasons: (1) she refused consent before signing the
form, and (2) the agents Aused@ Baker, the landlord, to assist them in obtaining her
consent.

A search
pursuant to voluntary consent is an exception to the requirement of a warrant
supported by probable cause.  See Reasor v. State, 12 S.W.3d 813, 817
(Tex. Crim. App. 2000).  The validity of alleged consent to search is a
question of fact to be determined from all the circumstances.  Guevara v.
State, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003) (citing Ohio v. Robinette,
519 U.S. 33, 40 (1996)).  The United States Constitution requires the State to
prove validity of consent by a preponderance of the evidence, while the Texas
Constitution requires the State to show by clear and convincing evidence that
consent was valid.  Id. (citing Maxwell v. State, 73 S.W.3d 278,
281 (Tex. Crim. App. 2002)).  The State must demonstrate that consent was in
fact voluntarily given, and was not the result of duress or coercion, whether
express or implied.  Reasor, 12 S.W.3d at 817 (citing Schneckloth v.
Bustamonte, 412 U.S. 218, 219 (1973)).  By reviewing the circumstances
prior to the search, the reaction of the accused to pressure, and any other
factor deemed relevant, a trial court can determine whether consent was given
voluntarily.  Id. at 818.








First,
appellant contends her signature on the consent-to-search form was  involuntary
because she previously refused consent.  However, the record reflects there was
a discussion between appellant and Agent Gordon regarding whether she had the
authority to consent to a search of the house.  At the suppression hearing,
Agent Gordon testified that after entering the house she said, Alet=s sit down.@  Agent Gordon and appellant sat on
the same sofa.  Five to ten minutes after the conversation began, appellant
asked if she could call a lawyer.  Appellant attempted to call a lawyer, but
she was not able to contact him.  Agent Gordon asked appellant to consent to
search of the house before and after the call.  Appellant never told Agent
Gordon that she did not want to talk unless her lawyer was present.  When
consent to search was initially requested, appellant told Agent Gordon that she
did not own the house, and her name was not on the lease.  Thereafter, when
Agent Gordon presented the consent form to appellant, she explained its
provisions and told her that she could consent for the officers to search
certain areas of the  home.  Appellant signed the form and orally consented to
a search of two bedrooms and the common areas.  

In her
brief, appellant contends Agent Terry Aacknowledged that for a period of at
least fifteen minutes after he arrived, appellant was refusing to give consent
to search.@ However, the record reflects that during cross-examination Agent Terry
acknowledged only that one could speculate appellant was Amaking up . . . excuses@ because she did not want the house
to be searched.  Furthermore, Agent Terry testified that approximately fifteen
minutes elapsed from the time of his initial contact with appellant in the
driveway to the time she signed the consent form.  Agent Terry did not testify
that appellant refused consent for fifteen minutes.  








Second,
appellant contends her consent was involuntary because the agents Aused@ Baker to Apersuade@ her to consent to the search. Again
Agent Terry testified that his conversation with Baker occurred outside the
house, where Baker informed him that the appellant was a resident but her name
was not on the lease.  At the suppression hearing, Agent Gordon testified that
she did not recall Baker having a conversation with appellant prior to the moment
appellant signed the consent form. Agent Gordon also testified that neither
Baker nor the other agents tried to intimidate appellant.  Agent Terry also
testified that Baker approached appellant in the house and said, ABrandi, you know what is going on
here.  Just letCif you let these people search and there=s nothing here then . . . they=ll be out of here.@  Agent Terry also testified that
appellant signed the consent form with the stipulation that Baker would observe
the agents as they searched her room.  Further, during direct examination,
Baker testified that, after talking with Agent Terry, she entered the house and
Aencouraged@ and Apushed@ appellant to sign the consent form. 
However, during cross-examination,   Baker testified that she was asked A[t]o go in there and talk to
[appellant] and see if [she] could get her to sign it.@  As the sole trier of fact and judge
of the credibility of the witnesses and their testimony, the trial court was
free to believe Agents Gordon and Terry.  See Maxwell, 73 S.W.3d at
281.  

Appellant
also refers to a list of relevant factors that the Supreme Court has considered
in determining voluntariness.  See Reasor, 12 S.W.3d at 818 (listing the
following factors: youth of the accused, education of the accused, intelligence
of the accused, constitutional advice given to the accused, length of
detention, repetitiveness of questioning, and use of physical punishment). 
Based on this list, appellant argues that the State produced no evidence
regarding appellant=s education or intellect.  However, this is merely a list of
factors which might be considered. The presence or absence of one or more
factors is not dispositive.    

The
record reflects the Agent Gordon offered appellant a consent form, explained
provisions, and told her that she could limit her consent to certain areas of
the house.  Appellant agreed to sign the consent form and requested that the
search be limited to common areas and her and her daughter=s bedrooms and that Baker observe the
search of her bedroom.  At the time she consented, she was sitting on the sofa
in her home, with plain clothed agents present, all of whom had their weapons
concealed.  To the extent that two agents are less threatening than three,
Agent Jones testified that he primarily remained outside the house while Agents
Gordon and Terry were talking with appellant inside the house.[3] 









Considering
all the circumstances and giving proper deference to the trial court=s determination, we hold that the
State proved by clear and convincing evidence that the appellant voluntarily
consented to the search.   See Guevara, 97 S.W.3d at 583.  We overrule
appellant=s third, fourth, and fifth issues.  Accordingly, the judgment of the
trial court is affirmed.

 

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered and Memorandum Opinion filed August
9, 2007.

Panel consists of Justices Frost, Seymore, and Guzman.

Do Not Publish C Tex. R. App. P. 47.2(b).

 

 

 

 

 

 









[1]  Appellant told the agents that she would not consent
to a search of the third bedroom because it belonged to her housemate, Shannon
Reed.  





[2]  A sidewalk, driveway, or entrance to a home offers
implied permission to anyone, including a law enforcement officer or common
citizen, to enter those areas to approach the front door.  See Cornealius v.
State, 900 S.W.2d 731, 733B34 (Tex. Crim.
App. 1995); Duhig v. State, 171 S.W.3d 631, 635 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).  





[3]  We note that the trial judge stated, AI find that the testimony of the officers was
credible.  And that I didn=t hear anything
that would lead me to believe that the consent was a product of coercion or
anything like that, that would make it an invalid consent.  I think at the end
of the day, she decided B she understood the document.  She decided to sign
it.  And which resulted in being able to go into the bedroom and find the
drugs.@