Affirmed; Opinion Filed March 22, 2013.



In The

# Court of Appeals
## Fifth District of Texas at Dallas

---

No. 05-11-01591-CR

---

## JUANITO MARSHALL, Appellant
V.
## THE STATE OF TEXAS, Appellee

---

On Appeal from the 265th Judicial District Court
Dallas County, Texas
Trial Court Cause No. F09-53984-R

---

## OPINION

Before Justices Lang-Miers, Myers and Richter[1]
Opinion by Justice Myers

Appellant Juanito Marshall pleaded guilty to possession with intent to deliver cocaine, pursuant to a plea agreement. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a). He was sentenced by the trial court to fifteen years' imprisonment and a $3,000 fine. In three issues, appellant contends the trial court erred by denying his pretrial motion to suppress. We affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

Jacob Cuevas testified at the hearing on appellant's motion to suppress that he worked for three years at the Greyhound bus station in downtown Dallas, Texas, as a licensed security guard

---

1. The Hon. Martin Richter, retired Justice, sitting by assignment.

for State Wide Patrol, a private security company hired to provide security and handle baggage screening at the bus station. Greyhound's policy provided for random hand searches of all baggage on certain randomly designated buses for items prohibited by Greyhound's rules. Notification of the search policy was included among other warnings printed—in both English and Spanish—on the back of each bus ticket and on a poster that was displayed on the wall of the bus station, not far from the ticket counter: "All persons, their belongings and packages, are subject to being searched at any time." The written warnings on the bus ticket also stated that Greyhound has a "zero tolerance" policy for violations of any law, rule, regulation or company policy. Purchasers who did not want their baggage searched were told they could have their money refunded and find other means of travel. The searches took place inside the bus station as people lined up to board the bus.

On April 20, 2009, at around 11:45 p.m., Cuevas was watching as other security personnel searched the baggage of every person in line to board a bus bound for Memphis and Chicago. Cuevas had been told to "check the line" and "look for any prohibited items." The security officers "scanned every person in that line; no one was singled out." After they searched and tagged every piece of luggage, Cuevas watched as the passengers boarded the bus. Passengers were informed before they boarded the bus that if they got off the bus, there was a possibility they could be left behind. Cuevas saw appellant board the bus, then immediately get "right back off." Appellant walked across the street to a waiting vehicle, a black four-door SUV whose engine was running, and grab a black luggage suitcase from the rear hatch of the vehicle. The vehicle drove away at a high rate of speed. Appellant attempted to place the suitcase next to the luggage that had already been searched. This behavior "grabbed" Cuevas's attention.

Cuevas and the other two Greyhound security personnel, J. Carroll[2] and Frankarlos Tovar, told appellant to either remove the item and have it searched or find some other form of travel. Appellant told them he did not mind if they checked the suitcase. He pulled the suitcase over to the side and started "patting himself around looking for the key," then told the security guards he did not have the key.

Cuevas asked appellant to step aside so the other passengers could continue boarding the bus. As appellant continued looking for the key, the security guards told him they had a way of opening the suitcase without damaging his property, and appellant said "okay." According to Cuevas, no one told appellant he had to stay; appellant wanted to stay. Cuevas testified that as Carroll started to open the suitcase appellant became "irate or kind of distraught and in the process of it pushed my officer back to gain possession of that suitcase." Cuevas described the contact by stating that appellant "swatted and pushed" Carroll's hand back, and that Carroll "pushed away because he wanted to keep [him]self clear to make sure that he wasn't in any type of physical harm."

Cuevas concluded, based on his training and experience, that appellant had assaulted the security guard. He handcuffed appellant, took him to an upstairs room, and "flagged" a Dallas police officer that happened to be "passing by in front of the Greyhound bus station." Cuevas was present when that patrol officer, Eric Weast, spoke to appellant. After appellant's handcuffs were removed, Cuevas heard the officer ask appellant "if that was his luggage," and appellant "denied any ownership of the luggage."

Weast testified that he went to the Greyhound station on April 20, 2009, because he had received a call from the security guards at the bus station. Weast recalled that he went to the

---

[2] The record does not reveal Carroll's full name, and he did not testify at the suppression hearing.

3

Greyhound station quite often—he noted it was "probably still the number one call location in the City of Dallas"—and that there were "a lot of disturbances" there, including intoxicated individuals, homeless persons, drug dealers, drug sales, drug trafficking, and "pimps." Weast also said he had been there "a number of times for trafficking." He had worked with the security officers at the bus station several times and "had given them a lot of instruction," including that if "they had drugs in a suitcase and they didn't have consent to open the suitcase," they should call police officers or 911 for assistance but not open the suitcase.

Appellant was still handcuffed when Weast first saw him. Weast met appellant in an upstairs room at the bus station, approximately eight to ten minutes after the guards called Weast for assistance. Appellant was nervous but "didn't seem violent by any means," so Weast ordered the handcuffs removed. Weast recalled specifically asking the three security guards in the room, each of whom carried a handgun, whether they had opened the suitcase, and the guards told Weast they had not opened the suitcase, which was locked. Weast went downstairs to obtain a consent to search form, then asked appellant for consent to search the suitcase. Appellant told Weast he did not know where the suitcase came from, he did not know who owned it, and he denied the suitcase was his. Weast said to appellant, "You're telling me the suitcase isn't yours?" Appellant replied "no, the suitcase wasn't his." Weast informed appellant that if he did not claim the suitcase, he was going to take the suitcase as abandoned property, search it, and place it in the Dallas Police Department property room. According to Weast, appellant never claimed ownership of the suitcase.

Weast testified that he searched the suitcase in front of appellant because he wanted to give him "every opportunity to claim the suitcase was his." Appellant indicated he did not have the key to the locked suitcase, so Weast "had one of the security guards pop the lock." The

suitcase did not appear to have been tampered with in any way. Weast found folded clothing in the suitcase and a "brick" of then-unknown substance. He called for assistance from another police officer who was certified in testing drugs; the substance tested positive for cocaine. After speaking to the security guards and reviewing a surveillance video recording that showed appellant had, according to Weast, maintained "care, custody and control of that suitcase," Weast arrested appellant. Weast's written police report was admitted into evidence.

State's exhibit three was the security video of the Greyhound bus terminal from August 20, 2009. The color video, which had no sound, was first played in court during Cuevas's testimony. As he watched the security video, Cuevas testified that appellant could be seen in the video standing in the middle of a line of people waiting to board the bus, wearing a light colored T-shirt. After boarding the bus, appellant exited the bus and headed in the direction of the bottom of the viewing screen—after which, according to Cuevas, he walked across the street to the waiting vehicle. Appellant then reentered the viewing screen and placed a black suitcase on the ground next to the other luggage, before attempting to board the bus. He was confronted by a security officer and pulled aside.

The security video showed that the security officer who confronted appellant, identified by Cuevas as Carroll, squatted down and attempted to open the suitcase as appellant stood adjacent. After watching him for approximately twenty-five to thirty seconds, appellant gestured to one of the other officers before bending over and reaching down toward Carroll's hands. Appellant was promptly handcuffed and escorted from the loading area by Carroll, Cuevas, and a third security officer. The time counter on the video footage showed that approximately four minutes passed between the moment appellant first boarded the bus and his detention by the security guards. Cuevas acknowledged that the poor quality of the video, which he agreed was

"choppy," made it difficult to determine whether appellant had any physical contact with Carroll. Cuevas said his testimony was based on his memory of the events.

The third security guard, Frankarlos Tovar, testified that he was a captain and "head line supervisor" for field operations at the Greyhound bus station. He was present during the baggage scans and searches at the bus station on the day in question and was supervising Carroll, who had been on the job only a few months. When the security guards first identified themselves to appellant and asked about the suitcase, Tovar recalled that appellant was cooperative but seemed "kind of nervous," a "little jittery," and made "a lot of eye movements," as if he was looking around and "trying to notice his surroundings." They asked appellant several times if he had any knives, weapons or anything illegal in the suitcase, or if there was any type of contraband in the suitcase. They told him several times that if he did not want his baggage searched, they would refund his money and he could find another means of travel. But appellant appeared determined to stay, according to Tovar.

Tovar testified that, before Carroll attempted to search the suitcase, he asked appellant again if there was anything in the suitcase they needed to know about. Appellant said "no, no, go ahead and search." When he noticed the suitcase was locked, Carroll asked appellant if there was a key. Appellant appeared to search his pockets and belongings for a key. When he could not find it, he told the security officers they could open the suitcase by other means. Tovar saw Carroll squat down to open the suitcase but did not see appellant actually come into "physical contact" with Carroll, nor was Tovar sure if Carroll "busted" the lock on the suitcase, because Tovar's attention was focused on the other passengers as they boarded the bus. The next thing Tovar recalled was Carroll telling him to "go 10-15," which was the security code for making an arrest, and he handcuffed appellant and escorted him to an upstairs room. Upstairs, they waited

for a Dallas police officer to arrive before opening the suitcase, which was on a table next to appellant. When Weast arrived, he spoke to Carroll before opening the suitcase.

On cross-examination, when Tovar watched the security video footage in court, he asserted that he could see Carroll bending over to touch the suitcase, followed by appellant squatting down to push away Carroll's hand. Tovar said appellant "moved" Carroll and that the contact was like a "push" or a "brush," suggesting appellant wanted Carroll to "free his hands from the baggage." Tovar also recalled appellant indicating he no longer wanted the suitcase to be searched. Tovar assumed appellant was trying to retrieve the suitcase because he wanted to leave. When Tovar handcuffed appellant, he asked Tovar if he "was going to jail" and Tovar "told him that was not up to me." Tovar initially suggested appellant was yelling when he said this but later admitted that, if appellant spoke loudly, he did so only because of disturbances and other general noise in the loading area.

The trial court denied appellant's motion to suppress. In its written findings, the court found that "Mr. Tovar had observed a breach of the peace, and therefore, his detention of the Defendant at that time was lawful." TEX. CODE CRIM. PROC. ANN. art. 14.01(a). Regarding Weast's search of the suitcase, the court found:

> When ownership of property is abandoned or disclaimed prior to search, there is no Fourth Amendment right against unlawful search since the Defendant has no legitimate expectation of privacy in the abandoned property. *See Hawkins v. State*, 758 S.W.2d 255, 257 (Tex. Crim. App. 1988). The Court, therefore, finds that when the Defendant denied ownership of the bag and voiced no objection to its search, he abandoned the bag absent any police misconduct, and therefore, lost the right to complain about the search of its contents. *State v. Velasquez*, 994 S.W.2d 676, 678-79 (Tex. Crim. App. 1999).

The court concluded by finding that "the Defendant was lawfully detained and that he disclaimed ownership of the bag and, therefore, had no right to privacy with regard to its contents." After the court denied the motion to suppress, appellant pleaded guilty before the court to possession

7

with intent to deliver cocaine, pursuant to a written plea agreement. The trial court sentenced appellant to fifteen years imprisonment and a $3,000 fine. This appeal followed.

## DISCUSSION

In three related issues, appellant challenges the trial court's denial of his pretrial motion to suppress. In his first issue, appellant contends the trial court erred by holding that appellant, a Greyhound bus passenger, and his bag were lawfully taken into custody by the civilian security guards at the Greyhound bus station. In his second issue, appellant argues the court erred by ruling he created reasonable suspicion of "drug trafficking and a breach of the peace offense." In his third issue, appellant contends the trial court erred by holding he could be arrested and his luggage seized "on less than probable cause that he committed an offense or that his luggage contained contraband." Given the interrelated nature of these arguments, we will address appellant's issues together.

### *Breach of the Peace*

Appellant complains that the security guards violated Texas law when they took him and the suitcase into custody because there was no reasonable suspicion to believe he committed a felony offense or a "breach of the peace." Citing article 14.01(a) of the Texas Code of Criminal Procedure, the State contends the security guards lawfully arrested appellant because appellant's conduct amounted to a breach of the peace.

When reviewing a trial court's ruling on a motion to suppress, we view all of the evidence in the light most favorable to the ruling. *State v. Garcia–Cantu,* 253 S.W.3d 236, 241 Tex. Crim. App. 2008). When the trial court makes explicit findings of fact, we afford those findings almost total deference as long as the record supports them, *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), regardless of whether the motion to suppress was granted or

denied. *Garcia–Cantu,* 253 S.W.3d at 241. The prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.* We afford the same amount of deference to the trial court's rulings on mixed questions of law and fact, if those rulings turned on an evaluation of credibility and demeanor. *Guzman,* 955 S.W.2d at 89. Other mixed questions of law and fact are reviewed de novo. *Kothe v. State,* 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004). We review de novo the trial court's application of the law. *State v. Ross,* 32 S.W.3d 853, 856 (Tex. Crim. App. 2000).

Article 14.01(a) provides that "[a] peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace." TEX. CODE CRIM. PROC. ANN. art. 14.01(a). Article 14.01(b) provides that a peace officer may arrest an offender without a warrant "for any offense committed in his presence or within his view." *Id.* "Thus, a peace officer may arrest offenders for any misdemeanor committed within his view as well as any such felony, while citizens may arrest only for a felony or a misdemeanor that is 'an offense against the public peace.'" *Miles v. State,* 241 S.W.3d 28, 39 (Tex. Crim. App. 2007).

An offense against the public peace or a breach of the peace is not statutorily defined. *See Andrade v. State,* 6 S.W.3d 584, 590 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); *Turner v. State,* 901 S.W.2d 767, 770 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd). The court of criminal appeals has explained the term "breach of the peace" this way:

> 'The term 'breach of the peace' is generic, and includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community; a disturbance of the public tranquility by any act or conduct inciting to violence or tending to provoke or excite others to break the peace; a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm disturbs the peace and quiet of the community. By 'peace,' as used in this connection, is meant the tranquility enjoyed by the

citizens of a municipality or a community where good order reigns among its members. Breach of the peace is a common-law offense. It has been said that it is not a specific offense, yet it may be, and at times is, recognized as such by statute or otherwise; and only when so regarded will it be considered in this article.

The offense may consist of acts of public turbulence or indecorum in violation of the common peace and quiet, of an invasion of the security and protection which the laws afford to every citizen, or of acts such as tend to excite violent resentment or to provoke or excite others to break the peace. Actual or threatened violence is an essential element of a breach of the peace. Either one is sufficient to constitute the offense. Accordingly, where means which cause disquiet and disorder, and which threaten danger and disaster to the community, are used, it amounts to a breach of the peace, although no actual personal violence is employed. Where the incitement of terror or fear of personal violence is a necessary element, the conduct or language of the wrongdoer must be of a character to induce such a condition in a person of ordinary firmness.'

*Woods v. State*, 152 Tex. Crim. 338, 213 S.W.2d 685, 687 (1948) (quoting *Head v. State*, 131 Tex. Crim. 96, 99, 96 S.W.2d 981, 982 (1936)); *see also Miles*, 241 S.W.3d at 40.

"The determination of whether an act amounts to a breach of the peace is done on a case-by-case basis, looking to the facts and circumstances surrounding the act." *Turner*, 901 S.W.2d at 770. Conduct that has been found to constitute a breach of the peace includes driving while intoxicated, possession of a handgun, loud swearing or cursing in a public place, the unprovoked assault by a man on a woman in a public place, throwing or swinging a beer bottle at another person, failing to stop and give information after a traffic accident, and criminal trespass on fenced land containing livestock by one who had previously been asked to leave. *Andrade*, 6 S.W.3d at 590 (citing additional authorities). In addition, in *Estes v. State*, 660 S.W.2d 873, 874-75 (Tex. App.—Ft. Worth 1983, pet. ref'd), the court found that a defendant who extended the middle finger of his right hand to a high school principal during commencement exercises had breached the peace because the obscene gesture amounted to "fighting words."

Appellant was charged with possession with the intent to deliver cocaine. A person commits an offense if he "knowingly manufactures, delivers, or possesses with intent to deliver a

controlled substance listed in Penalty Group 1." TEX. HEALTH & SAFETY CODE ANN. § 481.112(a). Cocaine is listed as a controlled substance under "Penalty Group 1." *Id.* § 481.102(3)(D).

In this case, after hearing all of the evidence, the trial court, citing article 14.01(a), found the security guard observed a breach of the peace and that appellant's detention was lawful. Given the circumstances of this case, we cannot say the trial court erred in reaching this conclusion. Appellant was in a crowded Greyhound bus station, at night, where police had been summoned on a number of occasions, including arrests for prostitution, intoxication, drug sales, and drug trafficking. Weast specifically noted that the police had been summoned to the bus station a number of times for drug trafficking, and that he had instructed the security guards at the bus station on how to handle suitcases or luggage suspected of containing drugs. The ticket appellant purchased stated—in both English and Spanish—that "[a]ll persons, their belongings and packages, are subject to being searched at any time." After being searched and boarding the bus, appellant was seen getting off the bus and walking across the street to a waiting SUV. He grabbed a black suitcase from the rear hatch of the vehicle, which quickly drove away at a high rate of speed.

Appellant placed the unchecked suitcase alongside the already searched luggage before attempting to "cut" the line and get back on the bus. One of the nearby security officers, Jacob Cuevas, found this behavior suspicious. Appellant was asked if he had anything illegal, either weapons or drugs, in the suitcase. He was told several times that he could take his suitcase and leave the bus station if he did not want the suitcase searched. During his encounter with the security guards, appellant was "looking around" and appeared "jittery" and "kind of nervous." When he could not find the key to the locked suitcase, appellant gave one of the guards

11

permission to open it if they could do so without damaging the lock. But after briefly watching Carroll struggle to open the lock, appellant bent down and pushed away Carroll's hand.

Based on these facts, there was reasonable suspicion to believe appellant was involved in the ongoing criminal activity of drug trafficking[3] and that appellant's conduct posed a threat of harm to himself and/or the public. Given also the number of disturbances that had occurred at the bus station as well as the fact that it was at night, crowded with passengers, and that the security guard was attempting to determine whether appellant was carrying any weapons or contraband, the evidence was sufficient in this case for the trial court to have concluded appellant committed a breach of the peace and that the citizen's arrest was proper under article 14.01(a).

### Abandonment

Having determined appellant was lawfully detained, we turn to the police officer's search of the suitcase. The State argues appellant had no reasonable expectation of privacy in the suitcase because he abandoned the property, and that Weast acted lawfully by opening it.[4]

Abandonment of property occurs if (1) the defendant intended to abandon the property and (2) his decision to abandon the property was not due to police misconduct. *Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003). "When the police take possession of property that has been abandoned independent of police misconduct, no seizure occurs under the Fourth Amendment." *Id.* In addition, when a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of the search. *Id.*

The record in this case shows that appellant voluntarily abandoned the property. When Weast asked appellant for consent to search the suitcase, appellant denied it was his suitcase.

---

[3] *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a).

[4] Appellant contends "the abandonment doctrine was inapplicable because a defendant's decision to disclaim ownership of a piece of property cannot be the result of illegalities, *i.e.*, it cannot have been coerced by the illegality." Since we have already concluded appellant was lawfully detained, we need not address this argument.

And when Weast told appellant that if he did not claim the suitcase it would be considered abandoned property, appellant continued to deny the bag was his. Because appellant disclaimed any ownership, if there was no police misconduct to force him to deny the suitcase, then there was no unlawful search. *See Hawkins v. State*, 758 S.W.2d 255, 257 (Tex. Crim. App. 1988) (when ownership of property is abandoned or disclaimed prior to search, no Fourth Amendment violation occurs because defendant has no legitimate expectation of privacy in property that has been abandoned); *see also Swearingen*, 101 S.W.3d at 101 (because defendant voluntarily abandoned property, he lacked standing to contest reasonableness of search); *State v. Velasquez*, 994 S.W.2d 676, 678–79 (Tex. Crim. App. 1999) (appellant abandoned bag containing cocaine and marihuana when he denied ownership at least twice and voiced no objection to officer's search of bag and there was no evidence of police misconduct); *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997) (intent to abandon may be inferred from words spoken, acts done, and other objective facts and relevant circumstances); *Bayhavong v. State*, No. 01–04–01120–CR, 2006 WL 407790, at *2–3 (Tex. App.—Houston [1st Dist.] Feb. 23, 2006, no pet.) (mem. op., not designated for publication) (denying ownership of a bag "is sufficient evidence of a person's intent to relinquish this expectation of privacy" in it) (citing *Tankoy v. State*, 738 S.W.2d 63, 67 (Tex. App.—Houston [1st Dist.] 1987, no pet.)).

On this record, we find no evidence of police misconduct. Absent such evidence, appellant lacked standing to complain about the search or any evidence obtained from it. *See Swearingen*, 101 S.W.3d at 101; *Hawkins*, 758 S.W.2d at 257. Thus, we cannot conclude the trial court abused its discretion by denying appellant's pretrial motion to suppress. We overrule appellant's issues.

We affirm the trial court's judgment.

_Lana Myers_

LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47



# Court of Appeals
# Fifth District of Texas at Dallas

**JUDGMENT**

Juanito Marshall, Appellant

No. 05-11-01591-CR     V.

The State of Texas, Appellee

On Appeal from the 265th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F09-53984-R.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Richter
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 22nd day of March, 2013.

_____
LANA MYERS
JUSTICE