Billy Lowell HAMMONS *v.* STATE of Arkansas

CR 96-413                                       940 S.W.2d 424

Supreme Court of Arkansas
Opinion delivered March 10, 1997

*Eddie N. Christian*, by: *Eddie Christian, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Billy Lowell Hammons appeals his convictions and sentences for possession of methamphetamine with intent to deliver and possession of marijuana with intent to deliver. He was sentenced to 40 years in prison with 10 years suspended on the first conviction and to 10 years on the second conviction, with the two sentences to run concurrently. He appeals and urges that the trial court erred in refusing to suppress the drugs seized in what he terms was an illegal arrest. We find no error in the trial court's ruling, and we affirm.

On March 1, 1995, Hammons was arrested for possession of controlled substances. He was charged on March 3, 1995, with possession of methamphetamine and marijuana with intent to deliver and with possession of dilaudid. The dilaudid charge was later *nolle prossed*. On June 12, 1995, Hammons moved to suppress certain drugs that were seized by a Fort Smith police detective following his March 1, 1995 arrest. At the hearing on Hammons's motion, Fort Smith Police Detective Dennis Alexander described the events surrounding the arrest. He testified that he received an anonymous call from a woman on February 23, 1995. The caller informed him that a man called "Wild Bill" of Wilburton, Oklahoma, was supplying a number of smaller dealers with

methamphetamine in both eastern Oklahoma and western Arkansas. She said these smaller dealers were friends of hers who had been arrested. One was the caller's roommate, and one was a woman named Shannon Smith. She related to Detective Alexander that "Wild Bill" drove a 70 or 80 model black Corvette, and that he was in his late 30's or early 40's, had a slender build, and often wore a mustache and a beard. Detective Alexander testified at the hearing that the caller's information was reliable because she was "very knowledgeable" about the methamphetamine trade in the area and about people who had been arrested for methamphetamine sales.

Detective Alexander next testified that on March 1, 1995, he received information from Fort Smith Police Detective Wayne Barnett, who had received information from the police dispatcher about a second anonymous call from a female who stated that one of the largest drug suppliers in the area would be at Old Town Grain and Feed, a local bar that sold alcoholic beverages, that evening and that he would be driving a black Corvette. Based on the tip, Detective Alexander and Detective Barnett drove through the area of Old Town three times and did not see the black Corvette. At approximately 11:30 p.m. that night, Detective Alexander, who was now alone and driving a Chevrolet Astro minivan, drove by Old Town and saw a black Corvette backed into a parking spot with two people sitting in the car. The dome light in the Corvette was on, which Detective Alexander testified was significant because he routinely checked cars in parking lots of drinking establishments with dome lights on to assist the State Alcoholic Beverage Commission in policing illegal drug and alcohol consumption in motor vehicles.

Detective Alexander stated that he circled the block and entered the parking lot, which was open to the public. As he pulled within five to ten feet of the Corvette, his headlights illuminated two people in the car. They both looked up and then began "scrambling" inside the car. Detective Alexander explained that they "began reaching down under the seat, turning and twisting as if they were trying to conceal something or put something up." He could look down inside the car from his vantage point and testified that he saw the driver (later identified as Hammons)

reach under his seat and come up with what the police detective believed to be a gun. At that point, Detective Alexander stated that he turned his blue light on to let the two people know that he was a police detective. (On cross-examination Detective Alexander contradicted himself and testified that he turned on his blue light when he saw the "scrambling.") He drew his pistol, stepped down from the minivan, and ordered the passengers to show their hands. The passenger (later identified as Michael David Rhea) complied, but Hammons had to be told five or six times to show his hands. After reaching under the seat again, Hammons did as he was instructed.

Hammons was ordered to exit the vehicle, and while doing so, he dropped a brown pouch on the ground. The police detective patted Hammons down for weapons and discovered a vial in his right coat pocket that contained an off-white, rock-like substance that he believed to be methamphetamine. He testified that he also found suspicious items on Rhea and in the pouch that Hammons dropped on the ground. Hammons told Detective Alexander that his nickname was "Wild Bill," and that he was from Wilburton, Oklahoma. A pistol was found in the Corvette under the driver's seat, with the magazine sitting on the console.

On cross-examination, Hammons's counsel attacked the reliability of the information received by Detective Alexander from the anonymous caller on February 23, 1995. Hammons's counsel emphasized that much of the caller's references to the methamphetamine trade could have been garnered from public records. He also questioned the accuracy of the information that had been relayed to Detective Alexander from the March 1, 1995 anonymous caller and later noted during examination of the police dispatcher that no details regarding name, time, or whether illegal drug transactions would transpire were imparted to the dispatcher.

The trial court denied Hammons's motion to suppress, and in doing so stated that it was basing its ruling primarily on the police detective's statement that the grounds for arrest developed on the parking lot where a dome light was on and where the detective saw the occupants "squirming" about in the Corvette,

trying to avoid something. The trial court concluded that these actions raised reasonable suspicion for the police detective to at least check out the circumstances. The trial court also concluded that in simply pulling the minivan up to the Corvette, the police detective had not blocked the Corvette's path, and that Hammons was free to leave. The court further observed that the sighted gun properly played a role in Detective Alexander's actions. Following this ruling by the trial court, Hammons entered a conditional plea of *nolo contendere* to the charges pursuant to Ark. R. Crim. P. 24.3 and was sentenced accordingly.

The sole issue on appeal is whether Detective Alexander had grounds to effect a seizure of Hammons under Ark. R. Crim. P. 3.1. In reviewing a trial court's denial of a motion to suppress, this court makes an independent determination based on the totality of the circumstances and reverses only if the ruling is clearly against the preponderance of the evidence. *Evans v. State*, 326 Ark. 279, 931 S.W.2d 136 (1996). *See also Illinois v. Gates*, 462 U.S. 213 (1983).

Rule 3.1 of the Arkansas Rules of Criminal Procedure provides in pertinent part:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct.

*Id.* This court has defined "reasonable suspicion" as "suspicion based upon facts or circumstances which give rise to more than a bare, imaginary, or purely conjectural suspicion." *Williams v. State*, 321 Ark. 344, 348, 902 S.W.2d 767, 769 (1995).

Hammons advances the theory that this was essentially an "informant" case, and that Detective Alexander's information was insufficient to form the reasonable suspicion necessary under Ark. R. Crim. P. 3.1 for a stop and detention. In making this assertion, he relies on *Lambert v. State*, 34 Ark. App. 227, 808 S.W.2d

788 (1991). In *Lambert*, the Arkansas State Police received an anonymous tip from a person in Little Rock that a man named "Jerry" would be leaving the Hot Springs area en route to Little Rock at approximately 3:00 p.m. and would be transporting approximately ten pounds of marijuana in a black truck with "Woodline Motor Freight" written on its side in orange letters. Acting on this information, a state trooper stopped a truck matching this description at approximately 3:50 p.m. The truck was heading from Hot Springs toward Little Rock on Highway 70. The driver identified himself as Jerry Lambert and admitted that he had marijuana in his vehicle.

Lambert's motion to suppress the marijuana was denied, and he pled guilty to possession of marijuana. On appeal, the Arkansas Court of Appeals reversed the trial court and suppressed the evidence, relying primarily on *Alabama v. White*, 496 U.S. 325 (1990). The United States Supreme Court refused to suppress the evidence in *Alabama v. White* but did so because the information collected from the anonymous tip was sufficiently corroborated. The court of appeals in *Lambert*, however, concluded that there was insufficient corroboration in that case. For example, the court pointed out that there was no verification of the departure point and no certainty that the driver was actually going to Little Rock. The court further made reference to an overall lack of detail in the anonymous call.

In *Alabama v. White, supra*, police officers received an anonymous tip that Vanessa White would be leaving 235-C Lynwood Terrace Apartments in Montgomery, Alabama, at a particular time in a brown Plymouth Station Wagon with a broken right taillight. The caller stated that White would be in possession of a brown attaché case containing approximately one ounce of cocaine and that she would be headed to the Dobey Motel. The police officers proceeded to the apartment complex, spotted White entering the station wagon, pulled her over just short of the Dobey Motel, and discovered the attaché case. The case contained marijuana, and approximately three milligrams of cocaine were found in White's purse. White entered a conditional plea of guilty on the narcotics charges after her motion to suppress was denied. The Court of Criminal Appeals of Alabama determined

that the officers lacked the reasonable suspicion necessary under *Terry v. Ohio*, 392 U.S. 1 (1968), and reversed her conviction. The Alabama Supreme Court denied certiorari, but the United States Supreme Court granted certiorari and reversed the intermediate appellate court. The Court acknowledged the general rule that an anonymous tip, standing alone, would not meet the requisite "reasonable suspicion" necessary for a stop under *Terry v. Ohio, supra*. The Court determined, however, that there was sufficient corroboration of the anonymous tip to uphold the stop, emphasizing that under the totality of the circumstances, the tip had proven to be reliable. The Court noted that the officers found a car matching the description in front of building 235 of the apartment complex and that the caller accurately predicted White's conduct of heading directly to the Dobey Motel.

Hammons argues that in the instant case Detective Alexander made no attempt to investigate, confirm, or corroborate the statements made in the March 1, 1995 anonymous telephone call. He further relies on *Meadows v. State*, 269 Ark. 380, 602 S.W.2d 636 (1980), for the proposition that his conduct and the conduct of his passenger, Michael Rhea, did not arouse any suspicions. In *Meadows,* police officers attempted to justify the stop of the defendant and another man for suspicious conduct because they walked quickly past police officers and continued to look back at them. The police accosted the two individuals, asked for their identification, and determined that the defendant had an outstanding felony warrant. After arresting the defendant, the officers found heroin for which he was prosecuted. This court reversed due to the fact that the police officers lacked reasonable suspicion for the stop under Rule 3.1. We stated:

> Here the officer's sole reason for approaching the two men was their conduct in looking back and in quickening their pace upon being followed. That conduct, however, could not possibly suggest that Meadows or Duncan had committed or were about to commit any *particular* type of felony or misdemeanor, which is necessarily what Rule 3.1 refers to.

*Meadows v. State*, 269 Ark. at 382-83, 602 S.W.2d at 638 (emphasis in original).

We affirm the trial court's ruling in the instant case, but we do so based on what developed in the Old Town parking lot, which aroused reasonable suspicion in Detective Alexander sufficient to meet the requirements of Rule 3.1. As an initial matter, we note that this court has stated: "Generally speaking, an officer would indeed be foolish to ignore an anonymous tip. So long as the officer does not invade the privacy and freedom of others, he is free to investigate any police matter in any manner not prohibited by law." *Willett v. State*, 298 Ark. 588, 593, 769 S.W.2d 744, 746 (1989), *quoting Burks v. State*, 293 Ark. 374, 378, 738 S.W.2d 399, 401-02 (1987).

We have no doubt that Detective Alexander was looking for a 70 or 80 model black Corvette in the Old Town area on the night of March 1, 1995. He admits as much. But, in addition, one of the jobs of the Fort Smith Police Department was to investigate "dome light cases" for the potential use of alcohol or illicit drugs in the parking lots of drinking establishments. Detective Alexander testified that he saw the black Corvette with the dome light on. He approached the Corvette on a parking lot open to the public to take a closer look and that is when he saw the two men scrambling and, ultimately, saw the gun in Hammons's hand. He either activated his blue light when he saw the movement in the Corvette, which included reaching under the front seat, or when he saw what he thought was a gun in Hammons's hand.

A person is "seized" for purposes of the Fourth Amendment when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Smith v. State*, 321 Ark. 580, 585, 906 S.W.2d 302, 305 (1995), *quoting United States v. Mendenhall*, 446 U.S. 544, 554, *reh'g denied*, 448 U.S. 908 (1980). Clearly, the mere approach of a police officer to a car parked in a public place does not constitute a seizure. *See, e.g., Thompson v. State*, 303 Ark. 407, 797 S.W.2d 450 (1990); *Phillips v. State*, 53 Ark. App. 36, 918 S.W.2d 721 (1996); *Adams v. State*, 26 Ark. App. 15, 758 S.W.2d 709 (1988).

For example, in *Thompson v. State, supra,* this court affirmed a conviction for DWI after first stating that the police officer's mere

approach to the parked car did not rise to the level of a seizure for Fourth Amendment purposes. We further observed that a non-seizure encounter was embraced in Ark. R. Crim. P. 2.2(a) as a request for information or for cooperation in a criminal investigation. We noted that in simply approaching the car, the police officer did not "restrain[ ] the liberty of the appellant by means of physical force or a show of authority." *Thompson v. State*, 303 Ark. at 410, 797 S.W.2d at 452. *See also Phillips v. State, supra* (involving an officer's approach to a van parked in the middle of the road); *Adams v. State, supra* (involving an approach to a car parked at night in a high school parking lot). *Cf. United States v. Kim*, 25 F.3d 1426 (9th Cir. 1994)(partial blocking of appellant's automobile by police car did not foreclose finding of no stop); *United States v. Packer*, 15 F.3d 654 (7th Cir. 1994)(stop occurred when officers blocked front and rear of automobile and shined lights into appellant's car); *United States v. Encarnacion-Galvez*, 964 F.2d 402 (5th Cir. 1992)(no stop occurred when officers made no "display of authority" and did not block appellant's automobile).

In the instant case, the question of the time of Hammons's seizure turns on when Detective Alexander showed a display of authority such that a reasonable person would not feel free to leave. We have no doubt that this occurred when the police detective put on his blue light. On direct examination, the detective's testimony was clear that he turned on his blue light after he saw what he thought was a gun. During cross-examination, however, the detective answered that the blue light was activated when he saw the two men scrambling in the Corvette, which was prior to the time that he saw the gun. These events, of course, transpired in a matter of seconds, and the detective appeared to give two different versions of their sequence. It is probably more believable that Hammons would pull out his pistol *before* the blue light came on. But, regardless, what decides this issue is the trial court's statement that the presence of the gun was a factor in its ruling that the stop passed muster. We read that to mean that the trial court gave credence to Detective Alexander's rendition of events in his direct examination where he stated that he turned on the blue light when he thought he saw the pistol. These combined circumstances were enough to raise reasonable suspicions in

the detective's mind about potential criminal activity, including risk to his own personal safety, when the anonymous tips, time, place, and actions by Hammons and Rhea, including pulling out the pistol, are all factored into the equation. Again, actual criminal activity is not the test; it is whether reasonable suspicion of criminal activity exists.

In sum, the two anonymous tips caused Detective Alexander to be in the Old Town vicinity the night of March 1, 1995, and to enter the Old Town parking lot. Though Hammons argues that the police detective was only acting on the March 1, 1995 tip, we believe it is reasonable to assume that both anonymous calls led him to the parking lot on the night in question. We further believe that the information gathered from the tips in conjunction with the hour of the night, the location, the policy of the Fort Smith Police Department to assist ABC efforts, and the Corvette's dome light being on justified an approach by Detective Alexander for investigative purposes, as contemplated by Ark. R. Crim. P. 2.2. The circumstances clearly warranted further inquiry. Once the two men began to "scramble" and reach under the front seat of their vehicle and once Detective Alexander thought he saw a pistol, this raised reasonable suspicion to warrant a stop and detention under Ark. R. Crim. P. 3.1 as either a potential felonious act or a misdemeanor causing injury by force.

We affirm the trial court's denial of the motion to suppress. Had this been a case where Detective Alexander stopped, detained, and then arrested Hammons solely on the basis of the anonymous tips, we would reverse the trial court. But it was not. We agree with the trial court that the actions on the Old Town parking lot converted the matter into a situation where a Rule 3.1 stop and detention was appropriate.

Affirmed.