

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOs. PD-0936-07 & PD-0937-07

### THE STATE OF TEXAS

#### v.

### CANDELARIO GARCIA-CANTU, Appellee

### ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE NINTH COURT OF APPEALS
### MONTGOMERY COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON and HOLCOMB, JJ., joined. KELLER, P.J., filed a dissenting opinion in which KEASLER and HERVEY, JJ., joined. KEASLER, J., filed a dissenting opinion in which KELLER, P.J., and HERVEY, J., joined.

## O P I N I O N

In this case, we examine the distinction between a citizen-police "encounter"and a citizen-police "detention." A "detention" implicates the Fourth Amendment's search and seizure restrictions and requires articulable suspicion to support even a temporary seizure, while an "encounter" is not subject to any Fourth Amendment requirements or restrictions.[1]

---

[1] We granted appellee's three grounds for review:

(1)    Whether the court of appeals eviscerated decades of well established US and Texas

We conclude that, under the totality of the circumstances test set out in *Florida v. Bostick*,[2] the trial judge did not err in finding that the officer's conduct in this case resulted in a Fourth Amendment detention. We therefore reverse the judgment of the court of appeals, which had held that the trial court improperly granted appellee's motion to suppress.[3]

I.

Appellee was charged with the misdemeanor offenses of possession of marijuana and carrying a weapon. At the hearing on the motion to suppress, the State and appellee agreed that the only issue to be litigated was whether the facts supported the finding of a Fourth Amendment detention or a consensual citizen-police encounter.[4]

Officer Okland testified that he had been with the Conroe Police Department for

---

Constitutional, statutory, and case law when it ruled that police officers were not required to have, much less articulate, a "reasonable suspicion" in order to initiate an investigation of an occupied, legally parked, non moving automobile, located in a narrow cul-de-sac.

(2)     Whether the court of appeals . . . violated its own stated standard of review articulated in *Ross*, 32 S.W.3d at 856 (citing *Romero v. State*, 800 S.W.2d at 543) to uphold the trial court's decision if it is correct on any theory of law applicable to the case.

(3)     Whether the actions of the police herein constituted a detention requiring reasonable suspicion.

[2] 501 U.S. 429 (1991).

[3] *State v. Garcia-Cantu*, 225 S.W.3d 820 (Tex. App.–Beaumont 2007).

[4] *See* State's Brief at 5 ("As the only issue addressed in the motion to suppress was whether Off. Okland had lawfully approached the truck, there was no testimony regarding either what evidence was discovered after Off. Okland approached Appellee or how it was discovered.") (citation omitted); *id.* at 8 n.3 ("The State agrees with Appellee that the evidence within the record tending to support reasonable suspicion was highly contested, and, as such, the trial court would not have abused its discretion in granting Appellee's motion to suppress if Appellee was, in fact, detained.").

eighteen months.  He was on routine patrol in the 300 block of South Pacific at about 4:00 a.m. on December 26th, when he saw a green Ford truck parked at the end of the block.[5] Officer Okland stated that the 300 block of South Pacific is a dead-end street, with two houses on the right, railroad tracks on the left, and high grass and woods at the end of the street.[6]  Officer Okland testified that this was a "high-crime" area for drugs and prostitution,[7] but when he was shown a written police call sheet, he did not dispute that there had been only two drug arrests in the prior six months and no prostitution arrests in that area.[8]  The officer

---

[5] In his offense report, Officer Okland wrote that the Ford was parked illegally on the left-hand side of the street.  During the hearing, Office Okland agreed that this was incorrect; he testified that the truck was parked illegally in the middle of the street.  But Officer Okland's dashboard-mounted video recorder shows that the truck was parked on the right-hand side of the street.  Officer McCreary, the back-up officer who arrived at the scene within five minutes, testified at first that the truck was parked "legally" on the right hand side of the road, but then he said that it was parked more than eighteen inches from the side of the road, so it was illegally parked.

[6] Photographs and the video recording confirm this physical description of the area.

[7] He defined a "high crime" area as one involving ten to fifteen arrests a month.

[8] It was at this point that the trial judge began questioning the witness in an increasingly skeptical manner.  He stated:

> I want to find out what the police have in numbers of incidents on this 300 block of South Pacific, within the past year, prior to this. . . . if he's going to say that he's here because this is a high crime area, then I want to see the facts that support a high crime area.  The facts that would support a high crime area would be the incident reports for at least a year prior to this incident date, and it would show whether we have a high crime area here or not . . . I don't have any evidence that convinces me this is a high crime area.  I'm trying to give the State an opportunity to come in and let's prove up what is being said.

The prosecutor, however, declined that invitation:  "Your Honor, the State is not going to take advantage of that.  We appreciate that."

Officer McCreary also testified that, had he been the first officer to drive by, he, too, would have investigated  "[b]ecause that vehicle has never been there.  It doesn't belong there." The trial judge then began questioning Officer McCreary:  "[I]s there any rule in Conroe that says

saw that the truck's dome light was on and two people were inside the truck. He decided to investigate.

Officer Okland turned on his patrol car spotlight "to make sure that they weren't doing harm to me." He was "letting them know it was a police officer behind them." But then he said, "If I had wanted them to know it was a police officer I would have turned my overhead lights on, to indicate I was detaining them. But I just wanted to see what they were doing in there." He was still driving up behind the truck at the time he put on his spotlight. Officer Okland parked his patrol car about ten feet behind the truck and to its left, and he turned on his dashboard-mounted camera to record the investigation. He then saw movement on the driver's side area of the truck.[9] He got out of his patrol car and began advancing toward the truck, holding a long flashlight in both hands at shoulder level as he walked forward. When Officer Okland played his flashlight across the driver's side of the truck, appellee got out of that side and met the officer in the middle of the road.

The trial judge questioned Officer Okland further: "[A]nd you got your spotlight on and you want me to believe that with a spotlight on, they could drive away?" Officer Okland said, "Yes," although he agreed that he had "[n]ever had anybody who has had his spotlight

---

a person can't park there between say midnight and 6:00 a.m.? Is there a rule about that?" "Not that I'm aware of," responded Officer McCreary. When the trial judge asked him what he saw about the truck or scene when he arrived that caused him to think that appellee's truck was a "suspicious vehicle," Officer McCreary said, "At the time that I arrived there, there was nothing suspicious."

[9] In his offense report, Officer Okland mentioned only that the front seat *passenger* appeared to be making movements toward the back of the truck.

turned on them drive away."  The trial judge continued to question the officer about the location of his patrol car which appeared to block appellee's truck at the end of the street:

Court:      They were stopped.  You just came up upon them.

Officer:    They would have to back up and I would have to move for them to–

Court:      Then you had them blocked in where they couldn't move?

Officer:    They could have backed up

Court:      They could have backed up?

Officer:    I would have moved.  I wouldn't have let them hit me.

Court:      Oh, could they have backed up and gotten out of the parked area they were in with you not having to move your vehicle?

Officer:    No sir.

Court:      So you were so close to them that they couldn't do anything but stay there, is that right?

Officer:    Well, I was a good ten–or about a car length away from their vehicle when I stopped.

Officer Okland then suggested that appellee could have backed up and driven on the wrong side of the roadway and around his patrol car, but the video indicates that the officer's car was parked well to the left side of the road.[10]  The trial judge asked a final question:

Court:      And what we have here is, you're telling me that if this person would have simply backed up, even though your overhead or your spotlight was on, or whatever was on, and you're pulled up within ten feet of this other vehicle, they were free to leave?  That's what you want me to believe?

---

[10] A photograph of the narrow, dead-end street shows that it was unlikely that two cars could fit side-by-side on the road.

Officer:       Yes, sir.

Mr. Garcia-Cantu, appellee, also testified. He said that he saw Officer Okland pulling up behind him, but he couldn't see anything more except a big spotlight, "a big white light." The officer didn't tell him that he could leave, and he didn't believe that he was free to leave. Mr. Garcia-Cantu said that he lives about two blocks away, on the other side of the railroad tracks, and this is his neighborhood. He has friends who live on that block, and he was just waiting for his friend who was inside the house.[11]

After hearing all of the testimony, the trial judge granted Mr. Garcia-Cantu's motion to suppress without making explicit factual findings, and the State appealed that ruling.

The court of appeals stated that "the record reveals the trial court required that Okland articulate a reasonable suspicion of criminal activity to justify his approach to Garcia-Cantu's truck and that Okland's use of the spotlight was sufficient to amount to a detention."[12] The court of appeals noted that this Court has previously held that a police officer's use of a spotlight was insufficient to amount to a Fourth Amendment detention.[13] The court of appeals concluded,

---

[11] Officer Okland agreed that appellee's friend came out of the house as soon as the officer got out of his patrol car. The video recording confirms this.

[12] 225 S.W.3d at 822.

[13] *Id.* at 823 (citing *Stewart v. State*, 603 S.W.2d 861, 862 (Tex. Crim. App. 1980) (police officer had spotlighted parked van in residential area at night and then approached it; court noted that the "mere approach of the police officer to the van interfered with no one's freedom of movement and caused minimal inconvenience and loss of time. There was no unconstitutional search or seizure.")).

We also find the trial court abused its discretion in determining under these circumstances that spotlighting Garcia-Cantu's truck resulted in Garcia-Cantu's detention.[14]

We granted appellee's petition to determine, *inter alia*, whether Officer Okland's actions constituted a detention requiring reasonable suspicion under *Bostick*'s "totality of the circumstances" test.

II.

## A.    Standard of Review

In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling.[15] When the trial court does not make explicit findings of fact, the appellate court infers the necessary factual findings that support the trial court's ruling if the record evidence (viewed in the light most favorable to the ruling) supports these implied fact findings.[16] Thus, we afford almost total deference to a trial judge's determination of the historical facts that the record supports, especially when his implicit factfinding is based on an evaluation of credibility and demeanor.[17] This same highly deferential standard applies regardless of whether the trial

---

[14] *Id.*

[15] *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

[16] *Kelly*, 204 S.W.3d at 819.

[17] *Ross*, 32 S.W.3d at 856.

court has granted or denied a motion to suppress evidence.[18] Thus, the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. But the question of whether a given set of historical facts amount to a consensual police-citizen encounter or a detention under the Fourth Amendment is subject to *de novo* review because that is an issue of law–the application of legal principles to a specific set of facts.[19]

## B.    Citizen-Police Encounters and Fourth Amendment Detentions

As the Supreme Court has aptly noted, "encounters between citizens and police officers are incredibly rich in diversity."[20] They run the gamut from "wholly friendly exchanges of pleasantries" to "hostile confrontations of armed men, involving arrests,

---

[18] *Id.* (applying "almost total deference" to trial court's implied factual findings and assessment of credibility and demeanor when it granted motion to suppress).

[19] *United States v. Tyler*, 512 F.3d 405, 409-12 (7th Cir. 2007) (given the totality of the circumstances established, question of whether officers "detained" defendant as a seizure under the Fourth Amendment reviewed *de novo* as a question of law); *United States v. Vera*, 457 F.3d 831, 834 (8th Cir. 2006) ("We review *de novo* whether there was a seizure, and we review the district court's factual determinations for clear error."); *United States v. Smith*, 423 F.3d 25, 31 n.4 (1st Cir. 2005) ("The conclusion, reached after review of all the facts of the encounter, that a seizure triggering the protections of the Fourth Amendment has occurred is a constitutional interpretation" and subject to *de novo* review); *see generally, Ornelas v. United States*, 517 U.S. 690, 691 (1996) ("we hold that the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*"); *Kothe v. State*, 152 S.W.3d 54, 62-63 (Tex. Crim. App. 2004) ("questions involving legal principles and the application of law to established facts are properly reviewed *de novo*" in deciding the question of the "reasonableness" of a detention for purposes of the Fourth Amendment).

[20] *Terry v. Ohio*, 392 U.S. 1, 13 (1968).

injuries, or loss of life."[21]  Given this wide diversity of police-citizen interaction, not every encounter between the two is subject to Fourth Amendment scrutiny.  It is only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen," will courts conclude that a Fourth Amendment "seizure" has occurred.[22] Such a seizure occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have 'communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[23]

In *Florida v. Bostick*,[24] the Supreme Court reiterated that an encounter between a police officer and a citizen "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature."[25]  In *Bostick*, the United States Supreme Court granted certiorari to determine whether the Florida Supreme Court's *per se* rule that police officers who boarded buses at scheduled stops and questioned passengers without articulable reasons for doing so necessarily "seized" those passengers within the meaning of the Fourth Amendment.[26]  The

---

[21] *Id.*

[22] *Id.* at 19 n.16.

[23] *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

[24] 501 U.S. 429 (1991).

[25] *Id*. at 434.

[26] *Id.* at 433 ("We granted certiorari . . . to determine whether the Florida Supreme Court's *per se* rule is consistent with our Fourth Amendment jurisprudence. . . .  The sole issue presented for our review is whether a police encounter on a bus of the type described above necessarily constitutes a 'seizure' within the meaning of the Fourth Amendment.").

Supreme Court rejected the lower court's *per se* rule because it "rested its decision on a single fact–that the encounter took place on a bus–rather than on the totality of the circumstances."[27] Thus, *Bostick* mandates that

> a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.[28]

While the "cramped confines" of a bus was certainly one relevant factor for the Florida courts to consider in evaluating whether a particular interaction between an officer and a citizen was a consensual encounter[29] or a Fourth Amendment detention, that single factor will not "be dispositive in every case."[30] The test is both objective and fact specific; "the 'reasonable person' test presupposes an *innocent* person."[31]

Police officers are as free as any other citizen to knock on someone's door and ask to talk with them, to approach citizens on the street or in their cars and to ask for information or their cooperation. Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-

---

[27] *Id.* at 437.

[28] *Id.* at 439.

[29] *Id.* at 438-39 (noting that "'[c]onsent that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse. The question to be decided by the Florida courts on remand is whether Bostick chose to permit the search of his luggage.")

[30] *Id.* at 439.

[31] *Id.* at 438.

window squeegee man.  All of these social interactions may involve embarrassment and

inconvenience, but they do not involve official coercion.  It is only when the police officer

"engages in conduct which a reasonable man would view as threatening or offensive even

if performed by another private citizen," does such an encounter become a seizure.[32]  It is the

display of official authority and the implication that this authority cannot be ignored, avoided,

or terminated, that results in a Fourth Amendment seizure.  At bottom, the issue is whether

the surroundings and the words or actions of the officer and his associates communicate the

message of "We Who Must Be Obeyed."

As Professor LaFave has noted, this approach is useful when examining police

contacts with citizens seated in parked cars.[33]

> The mere approach and questioning of such persons does not constitute a
> seizure.  The result is not otherwise when the officer utilizes some generally
> accepted means of gaining the attention of the vehicle occupant or encouraging
> him to eliminate any barrier to conversation.  The officer may tap on the
> window and perhaps even open the door if the occupant is asleep.  A request
> that the suspect open the door or roll down the window would seem equally
> permissible, but the same would not be true of an order that he do so.
> Likewise, the encounter becomes a seizure if the officer orders the suspect to
> "freeze" or to get out of the car.  So too, other police action which one would
> not expect if the encounter was between two private citizens–boxing the car
> in, approaching it on all sides by many officers, pointing a gun at the suspect
> and ordering him to place his hands on the steering wheel, or use of flashing
> lights as a show of authority–will likely convert the event into a Fourth
> Amendment seizure.[34]

---

[32]  WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.4(a), at 427 (4th ed. 2004).

[33] *Id.* at 433.

[34] *Id.* at 433-35 (footnotes omitted).

Each citizen-police encounter must be factually evaluated on its own terms; there are no *per se* rules.[35] "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."[36] The officer's conduct is the primary focus, but time, place, and attendant circumstances matter as well. "A court must step into the shoes of the defendant and determine from a common, objective perspective whether the defendant would have felt free to leave."[37]

---

[35] *Bostick*, 501 U.S. at 440 ("The Florida Supreme Court erred in adopting a *per se* rule."); *see also People v. Paynter*, 955 P.2d 68, 73 (Colo. 1998) ("rather than rely upon a single factor and announce a *per se* rule, a court must consider the totality of the circumstances to determine whether the police exercised force or authority to effect a stop, or whether the police merely sought the voluntary cooperation of a citizen through a consensual encounter.").

In *Paynter*, the Colorado Supreme Court mentioned numerous factors which might contribute to a finding, based on the totality of the circumstances, that a particular police encounter with a person in a parked car would constitute a Fourth Amendment seizure. These included: (1) whether there was a display of authority or control over the defendant by activating the siren or any patrol car overhead lights; (2) the number of officers present; (3) whether the officer approached in a non-threatening manner; (4) whether he displayed a weapon; (5) whether he requested or demanded information; (6) whether the officer's tone of voice was conversational or whether it indicated that compliance with the request for information might be compelled; (7) whether the officer physically touched the person; (8) whether an officer's show of authority or exercise of control over a person impeded that person's ability to terminate the encounter; (9) the duration of the encounter; and (10) whether the officer retained the citizen's identification or travel documents. *Paynter*, 955 P.2d at 73-75.

[36] *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

[37] *United States v. Steele*, 782 F. Supp. 1301, 1309 (S.D. Ind. 1992).

III.

With that general background, we turn to the present case.  Here, the court of appeals relied upon one single fact and found it dispositive.  It concluded that Officer Okland's use of his spotlight did not effect a Fourth Amendment seizure.[38]  It quoted from an Idaho Supreme Court decision: "A rule that an officer's use of a spotlight creates a *per se* detention would discourage office[r]s from using such lights when necessary for their safety or the safety of others."[39]  Indeed, that is  correct:  *Bostick* stands for the proposition that *per se* rules generally do not determine whether any specific citizen-police encounter amounted to a Fourth Amendment detention.  Instead, trial and appellate courts must view "the totality of the circumstances" of the encounter in the light most favorable to the trial judge's implicit (or explicit) factual findings.  The question of when an encounter between police officers and a person in a car constitutes a "seizure" depends on specific facts as to the manner of the encounter, the degree of authority displayed, and all other circumstances surrounding the incident.  Just as with the determination of probable cause, a piecemeal or "divide and conquer" approach is prohibited.[40]

---

[38] *Garcia-Cantu*, 225 S.W.3d at 823 ("We also find the trial court abused its discretion in determining under these circumstances that spotlighting Garcia-Cantu's truck resulted in Garcia-Cantu's detention.").

[39] *Id.* (quoting *State v. Baker*, 107 P.3d 1214, 1218 (Idaho 2004)).

[40] *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007) ("When determining probable cause, an appellate court considers the totality of the circumstances. This means that a 'divide-and-conquer' or piecemeal approach is prohibited.") (footnote omitted).

In this case, the totality of the circumstances, viewed in the light most favorable to the trial judge's ruling, show:

1.    Officer Okland decided to "investigate" the presence of appellee's truck parked at the dead-end portion of the 300 block of South Pacific.[41]

      The video recording supports the trial judge's implicit finding that Officer Okland used an authoritative, commanding voice and demeanor that brooked no disagreement into his official investigation. Although reasonable fact finders could disagree, we must give great deference to the trial judge's assessment of the facts.

2.    It was 4:00 a.m. on December 26th, Christmas night.[42]

---

[41] Because the Fourth Amendment test is an objective one, an officer's subjective intent "to investigate" is relevant only to the extent to which such an intent is communicated to the citizen by means of an authoritative voice, commanding demeanor, or other objective indicia of official authority. *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ("a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . ., nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement . . ., but only when there is a governmental termination of freedom of movement *through means intentionally applied*."); *see generally,* LaFave, § 9.2(a), at 414 ("The objective nature of the test also means that whether an encounter has become a seizure 'depends on the officer's objective behavior, not any subjective suspicion of criminal activity'; in other words, it is *not* the case that an 'officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing.'") (quoting *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000)).

[42] The lateness of the hour may be subject to various different inferences:  It may indicate a natural community-caretaking concern on the part of an officer or a fellow citizen–is this person safe or has this truck been abandoned?  Alternatively, it may indicate that the encounter is taking place at a time and setting in which one is isolated from the public and the reasonable person would be especially vulnerable to official coercion and authority. *See State v. Morris*, 72 P.3d 570, 579 (Kan. 2003) (noting that activating patrol-car emergency lights does not inevitably signal a Fourth Amendment seizure because they might be activated for community-caretaking purposes, but concluding that a reasonable person in this defendant's position, parked at night in a remote public park location, would not conclude that any travelers were in need of assistance; "a reasonable person would not believe that the lights had been activated for safety reasons. There was no showing that other traffic necessitated activating the emergency lights."); *Swift v. State*, 899 A.2d 867, 877 (Md. 2006) (noting that the "time of night of the encounter [3:13 a.m.], the officer's conduct before he approached petitioner [repeatedly driving past him as he was walking in a 'high crime area'], the blocking of petitioner's path with the police cruiser,

3.    Officer Okland turned on his patrol-car spotlight to light up appellee's truck even before he stopped his car, and he activated his dashboard camera to record the encounter.[43]

---

headlights shining on petitioner, the officer's testimony that he was conducting an investigatory field stop, and the warrants check, taken together, lead us to conclude that petitioner was seized"); *see generally United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (noting that the trial court, "required to assess the totality of the circumstances, failed to consider adequately two significant factors: the place and the time of the encounter. The police confronted the appellants in the middle of the night and sought admission to their dwelling place."). Although a late-night police encounter at someone's home carries a significantly greater potential for objectively communicating coercive authority, the place and time of a police encounter with citizens in a parked car is not wholly irrelevant in assessing the totality of the circumstances. It is a reasonable inference that the objectively reasonable person would feel freer to terminate or ignore a police encounter in the middle of the day in a public place where other people are nearby than he would when parked on a deserted, dead-end street at 4:00 a.m.

[43] The use of "blue flashers" or police emergency lights are frequently held sufficient to constitute a detention or seizure of a citizen, either in a parked or moving car. *See, e.g., Hammons v. State*, 940 S.W.2d 424, 427-28 (Ark. 1997) (defendant sitting in parked automobile was seized when police activated blue light; light was display of authority that would indicate to reasonable person he was not free to leave); *People v. Bailey*, 176 Cal. App. 3d 402, 405-06 (Cal. Ct. App. 1985) (officer pulled in behind parked car and activated emergency lights; defendant seized as reasonable person would not have felt free to leave); *State v. Donahue*, 742 A.2d 775, 779-80 (Conn. 1999) (defendant was seized when officer pulled up behind parked vehicle and activated red, yellow, and blue flashing lights); *Hrezo v. State*, 780 So. 2d 194, 195 (Fla. Dist. Ct. App. 2001) (when a police officer turns the emergency and takedown lights on behind a lawfully parked vehicle, a reasonable person in that vehicle would expect to be stopped if he or she drove away); *Lawson v. State*, 707 A.2d 947, 949-50 (Md. 1998) (the activation of the emergency lights was a show of authority that constituted a seizure because it communicated to a reasonable person in the parked car that there was an intent to intrude upon the defendant's freedom to move away); *State v. Walp*, 672 P.2d 374, 375 (Ore. Ct. App. 1983) (use of emergency lights after defendant had voluntarily stopped was sufficient show of authority and reasonable person would not have felt free to leave); *State v. Gonzalez*, 52 S.W.3d 90, 97 (Tenn. Crim. App. 2000) (a police officer clearly initiates a seizure by turning on his blue lights behind a parked vehicle because the lights convey the message that the occupants are not free to leave); *State v. Burgess*, 657 A.2d 202, 203 (Vt. 1995) (even if officer subjectively intends to activate his blue lights for safety reasons, the use of the lights on the defendant served as a restraint to prevent his departure from the pull-off area of the road); *Wallace v. Com.*, 528 S.E.2d 739, 741-42 (Va. Ct. App. 2000) (driver of parked vehicle seized because a reasonable person with a police cruiser parked behind him with its emergency lights flashing would not have felt free to leave); *State v. Stroud*, 634 P.2d 316, 318-19 (Wash. Ct. App. 1981) ("the officers' attempt to summon the occupants of the parked car with both their emergency lights and high beam

4.    He parked his patrol car about ten feet behind and to the left of appellee's truck. The testimony, photographs, and video recording all support the trial judge's implicit factual finding that Officer Okland "boxed in" appellee's parked truck, preventing him from voluntarily leaving.[44]

---

headlights constituted a show of authority sufficient to convey to any reasonable person that voluntary departure from the scene was not a realistic alternative" and, had driver attempted to leave after being so signaled, he could arguably have been charged with misdemeanor).

The use of a patrol car spotlight, however, may also indicate to the reasonable person that the officer is carrying out his community caretaking function, and such conduct is frequently necessary to protect officers during any type of night-time police-citizen encounter. Thus, the use of a spotlight, by itself, is not a circumstance that necessarily converts a consensual encounter into a Fourth Amendment detention. *See State v. Baker*, 107 P.3d 1214, 1218 (Idaho 2004) ("This court joins the many other jurisdictions which have held that the use of a spotlight alone would not lead a reasonable person to believe that he was not free to leave, though it may be considered under the totality of the circumstances."); *People v. Cascio*, 932 P.2d 1381, 1388 (Colo. 1997) (officers' use of a spotlight and flashlights were "a matter of practical necessity as the encounter took place when it was getting dark, and we do not attribute any significance to their use."); *State v. Clayton*, 45 P.3d 30, 35 (Mont. 2002) ("The police officers did not initiate the stop, but only pulled in behind [the defendant] and shined the spotlight to determine how many people were in the vehicle. The officers did not have their sirens or emergency lights on and the encounter took place on a public street."); *State v. Calhoun*, 792 P.2d 1223, 1225 (Or. Ct. App. 1990) (noting that the "fact that the headlights and spotlight were on did not transform the encounter into a stop," where the officer did not park in such a way that prevented the defendant from driving away).

On the other hand, the use of a spotlight, combined with other circumstances, may well establish a Fourth Amendment detention. *See Commonwealth v. Mulholland*, 794 A.2d 398, 402 (Pa. Super. Ct. 2002) (based on totality of circumstances–including facts that officer, "determined to investigate, parked his cruiser in such a fashion as to make it difficult if not impossible for the van to leave the parking lot. . . . [and] [b]efore exiting his cruiser, the officer shone bright, spotlight-like lights in the direction of the van"–evidence supported a finding that officer detained defendant).

[44] Most courts have held that when an officer "boxes in" a car to prevent its voluntary departure, this conduct constitutes a Fourth Amendment seizure. *See, e.g., Riley v. State*, 892 A.2d 370, 374 (Del. 2006) ("when police approached the Escort with their badges and flashlights, after having parked their police vehicle behind the Escort so as to prevent it from driving away, a seizure had taken place for purposes of Fourth Amendment analysis"); *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (stating that when officers' vehicles were parked both in front and behind defendant's car with a "take down" light shining through his windows and officer approached car with a flashlight and asked occupants to put their hands in the air where she could see them, defendant was detained); *United States v. Pavelski*, 789 F.2d 485, 488-89 (7th Cir. 1986) ("A reasonable person in this situation, bounded on three sides by

_____

police patrol cars, would not have believed that he was free to leave.  Indeed, we wonder whether appellants could have maneuvered their car out of the parking lot in this situation."); *United States v. Kerr*, 817 F.2d 1384, 1386-87 (9th Cir. 1987) ("Kerr stopped and exited his car primarily in response to Deputy Hedrick's official appearance and conduct, rather than of his own volition. Arriving in uniform and in a marked patrol car, Deputy Hedrick unquestionably appeared to be acting in an official capacity.  Instead of waiting in his patrol car at the roadside, or parking and walking, Deputy Hedrick pulled into and blocked the one lane driveway as Kerr was backing out. Deputy Hedrick's conduct thus precipitated the confrontation with Kerr."); *State v. Struhs*, 940 P.2d 1225, 1227-28 (Utah 1997) (totality of circumstances showed Fourth Amendment detention; "Defendant claims that the officer's action of parking nose-to-nose about one car length away when his car was backed up against a barricade essentially 'blocked defendant in' so he was unable to move. While defendant was not completely blocked in, the officer's positioning of her vehicle is certainly a factor that weighs in favor of finding under a totality of the circumstances that defendant was seized."); *State v. Roberts*, 977 P.2d 974, 979 (Mont. 1999) (concluding that defendant was detained when officer "pull[ed] into the one-lane driveway and block[ed] Roberts' exit, thereby physically constraining Roberts' means and direction of travel. Furthermore, Officer Oster was armed and in uniform, and his show of authority in immediately exiting his patrol car and approaching Roberts added to the official nature of the encounter. Given these circumstances, the District Court correctly concluded that '[a] reasonable person would not have felt free to leave a situation where a uniformed officer, in his patrol car, pulled his car into a driveway behind that person's car, blocking its exit.'"); *State v. Jestice*, 861 A.2d 1060, 1063 (Vt. 2004) (finding a Fourth Amendment detention because of "the show of authority present in this case, where a uniformed officer parked his marked patrol car nose-to-nose against a couple's car late at night in a darkened trailhead parking lot with no one else around, left the cruiser's headlights shining in their faces as he approached them, and asked them what they were doing."); *McChesney v. State*, 988 P.2d 1071, 1075 (Wyo. 1999) (finding a Fourth Amendment detention when officer activated his emergency lights and blocked defendant's car in; "Officer Will parked his vehicle directly behind McChesney's, which was parked at the convenience store's front doors.  McChesney's vehicle was thus blocked in, and he could not have driven away had he wanted to.  Such action has also been found sufficient to constitute a seizure. *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 108, n.96.").

On the other hand, when an officer only partially blocks a parked car or merely makes it somewhat inconvenient for the citizen to depart voluntarily, such action is not necessarily, by itself, sufficient to constitute a Fourth Amendment detention.  *See, e.g., United States v. Kim,* 25 F.3d 1426, 1430-31 (9th Cir. 1994) (no detention "where, as here, officers came upon an already parked car," even though police car "partially blocked" that car); *People v. Cascio*, 932 P.2d 1381, 1386-87 (Colo. 1997) (noting that, in determining whether the totality of the circumstances established a detention of a citizen in a parked car, "courts have deemed the position of the patrol car relative to the motorist's vehicle an important consideration"; surveying cases and concluding that "if the police patrol car wholly blocks the defendant's ability to leave, courts have held that a reasonable person would not feel free to leave, so that the encounter cannot be adjudged consensual," but when "egress was only slightly restricted. . . with approximately ten to twenty

5.      Officer Okland got out of his patrol car, holding his large flashlight in both hands at shoulder-level, and started to approach the driver's side of appellee's truck in a manner that could fairly be described as authoritative.[45]

6.      Appellee then got out of his truck and started to walk toward Officer Okland, who immediately asked, "What are you doing here?"[46]

Although these words are not, by themselves, sufficient to convert an otherwise consensual encounter into a detention, much depends upon the tone and level of voice, as well as the questioner's demeanor. The trial judge could have concluded that, based upon Officer Okland's tone and demeanor on the witness stand, as well as his tone and demeanor as seen and heard on the video recording, that the officer's questioning was more in the nature of an official command rather than a friendly or neutral inquiry.[47]

---

feet between the two vehicles" and the defendant "would have been able to leave by maneuvering the van in a manner akin to parallel parking," this fact was insufficient, by itself, to establish a detention).

[45] *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (noting that one factor to consider in deciding whether a police-citizen encounter is a Fourth Amendment "seizure" is "the use of language or tone of voice indicating that compliance with the officer's request might be compelled"); *Orhorhaghe v. INS*, 38 F.3d 488, 495-96 (9th Cir. 1994) (Fourth Amendment seizure supported by finding that agent acted in "an officious and authoritative manner" that indicated to defendant that he was not free to decline agent's requests; "The tenor of the agent's instruction was not that of 'every citizen' addressing questions to fellow citizens; it was brusque and authoritative and appeared to give [defendant] no option to refuse to comply. [Agent] testified that he said words to the effect of 'Let's go into your apartment.' To a reasonable person under the circumstances, this statement bears the indicia of a command, not a request.").

[46] The State asserts that the trial judge concluded that Officer Okland "detained" appellee merely by approaching the truck. This is not correct, nor is it what the trial judge necessarily concluded. Suppose that Officer Okland's first words to appellee had been: "We're looking for a little four-year-old girl with blond pigtails in pink pajamas who wandered away from her home two blocks over. Have you seen her?" What looked like the beginning of a Fourth Amendment detention has, by the officer's words, been immediately converted into a community-caretaking, police-citizen encounter. Thus, it is not the officer's mere approach that defines the detention; it is the totality of the circumstances as they unfolded, both before and after that approach.

[47] *See Bostick*, 501 U.S. at 437 (noting that officers specifically advised defendant that he could refuse consent and explaining that "no seizure occurs when police ask questions of an individual . . . so long as the officers do not convey a message that compliance with their requests

7.    Officer Okland then played his flashlight across the female passenger's side of the truck to track the passenger's exit from the truck. She came around to where the officer and appellee were standing at the rear of the truck.

8.    Officer Okland then played his flashlight into and across appellee's eyes as if he were looking for signs of intoxication. He did the same to appellee's friend who came out of the house.

9.    Officer Okland then asked appellee, "You got any I.D. on you?" Apparently appellee said that it was in the truck because Officer Okland immediately went back to the driver's side and looked inside the truck. He then came back to the rear of the truck and told appellee to go get his I.D. out of the truck. Appellee did so.

10.    Appellee testified that he did not subjectively feel free to leave or terminate the encounter.

    That fact is not particularly relevant because the test is whether a *reasonable* person in the citizen's position would have felt free to leave.[48] However, given the facts that Officer Okland initiated the incident by blocking appellee's exit with his patrol car, turning on his spotlight, approaching appellee's truck with a long flashlight playing over the driver's side, immediately saying, "What are you doing here?", using his flashlight to wave the passenger back to the rear of the truck, and, standing toe-to-toe with appellee, shining his flashlight into appellee's eyes, it is hard to conclude that

is required"); *United States v. Bueno*, 21 F.3d 120, 124 (6th Cir. 1994) (no detention when "questions were posed in a calm and non-threatening way"); *United States v. Springs*, 936 F.2d 1330, 1333 (D.C. Cir. 1991) (no seizure when officer "never exhibited a weapon" and "spoke in a normal, conversational tone of voice"); *State v. Grant*, 392 So.2d 1362, 1365 (Fla. Dist. Ct. App. 1981) (officer "did not order Grant to comply with his request" for information, and "the tone of the entire approach appears to have been non-authoritative").

    [48] In *California v. Hodari D.*, 499 U.S. 621 (1991), the Supreme Court reviewed the objective test set out in *Mendenhall* and clarified that *Mendenhall*

    states a *necessary*, but not a *sufficient*, condition for seizure–or more precisely, for seizure effected through a 'show of authority.' *Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.

*Id*. at 628.

any reasonable person would feel free to drive or walk away or to terminate the questioning.

Viewing the totality of these particular circumstances in the light most favorable to the trial court's ruling, we hold that the trial court did not err in concluding that a reasonable person in appellee's position would not have felt free to leave or terminate this encounter with Officer Okland.

The State argues that the evidence was "undisputed" in many respects in which the trial court obviously did find it disputed. For example, the State argues: "It is also undisputed that the location of Off. Okland's patrol car approximately one car length behind Appellee's truck did not prevent Appellee's egress."[49] "[T]he incontrovertible evidence shows that Appellee was free to leave in his vehicle if he so chose. . . . Off. Okland testified only that Appellee could not back straight out of his parking place without hitting the patrol car."[50] The trial judge, however, was not required to believe this particular testimony, and his skeptical questioning of Officer Okland supports the inference that he did not. The State also argues that "the record unequivocally shows that Appellee had two other available means of driving away from the scene."[51] He could have turned around in a driveway that is partway down the street or he could have made a U-turn over the railroad right-of-way.[52]

---

[49] State's Brief at 6.

[50] *Id.* at 11-12.

[51] *Id.* at 12.

[52] *Id.*

Had the trial court ruled against appellee, we would have to defer to the trial judge's implicit factual finding that these methods of egress were possibilities (although the photographs and videotape do not necessarily support them), but the trial court implicitly found that appellee was blocked in by Officer Okland and the patrol car, and that appellee could not move his car.

In sum, the State does not quarrel with the law or its application; it simply has a different view of the evidence and of the inferences to be drawn from that evidence. Had the trial court agreed with the State's view of the evidence and ruled against appellee because "the incontrovertible evidence show[ed] that Appellee was free to leave in his vehicle if he so chose," we could uphold such a fact finding based upon the totality of the circumstances and the credibility of the witnesses.[53]

The court of appeals erred in focusing upon one single fact–Officer Okland's use of a spotlight–instead of the totality of the circumstances. We conclude that, viewed in the light most favorable to the trial judge's ruling, the totality of the circumstances support his conclusion that appellee was detained by Officer Okland for purposes of the Fourth Amendment. We therefore reverse the judgment of the court of appeals, uphold the trial court's suppression ruling, and remand the case for further proceedings in the trial court.

Delivered: May 7, 2008

Publish

---

[53] *See Bostick*, 501 U.S. at 439; *Brower*, 489 U.S. at 596-97; *Chesternut*, 486 U.S. at 573-74; *Steele*, 782 F. Supp. at 1309; *Mulholland*, 794 A.2d at 401-02; *see also supra* note 44.