

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00069-CR

Charles Arthur **WARREN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR9856B
Honorable Ron Rangel, Judge Presiding

Opinion by: Patricia O. Alvarez, Justice

Sitting: Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: July 1, 2015

AFFIRMED

Appellant Charles Arthur Warren was charged by indictment with possession of marijuana in an amount greater than fifty pounds, but less than 2,000 pounds. After the trial court denied Warren's motion to suppress, Warren entered a plea of nolo contendere and the trial court deferred a finding of guilt and placed Warren on probation for a term of six years. On appeal, Warren contends (1) the State failed to prove, by clear and convincing evidence, that Warren gave his consent freely and voluntarily, and (2) the length of the detention tainted any alleged consent provided by Warren. We affirm the trial court's order.

**FACTUAL BACKGROUND**

On July 3, 2012, San Antonio police officers were notified of a possible large narcotic shipment being transported in a white Ford F-250 pickup truck towing a trailer with a small car on the trailer. The truck was reportedly traveling east on IH-10 and then north on Loop 1604. Between 8:00 and 9:00 p.m., officers located the truck being driven by Warren and observed three traffic violations: (1) the trailer's license plate was not properly illuminated, (2) the truck crossed the median, and (3) the truck crossed the double-white line. San Antonio Police Officer Robert Dupee described the truck as traveling "far right off the yellow line into the median and then [the truck] went over the dotted line back across the same lane of travel, [the truck] went back across over the dotted line and back over into the lane of travel he was supposed to be in."

The officers initiated a traffic stop without incident. Officer Dupee approached Warren's truck on the passenger side and Officer Francisco Galvan was on the driver's side. Although Warren denied that he had been drinking, Officer Dupee noticed "a half empty can of beer. I believe it was Schlitz or something like that or a can. I don't know if it was half empty or full. I just noticed a can of beer."

Officer Galvan requested Warren exit the truck so that he could "check his eyes." The officers walked Warren to the back of the trailer and in front of the police vehicle. Officer Galvan conducted the horizontal gaze nystagmus test and asked Warren a number of questions: "where [was] he coming from, how much he had to drink." As Officer Dupee explained, "[they] were monitoring his mannerisms to see if he had been too intoxicated to drive."

During this time, Officer Dupee testified "We asked [Warren] if we could search the vehicle and trailer." According to Officer Dupee, "[Warren] said, Yes, go right ahead." While looking in the truck, Officer Galvan signaled Officer Dupee to detain Warren for further

investigation. Officer Dupee testified that he told Warren "I'm just putting on your handcuffs; it doesn't mean you're under arrest; I'm just detaining you; my partner's seen something."

Officer Dupee continued that Warren's mannerisms completely changed at that point.

"His shoulders went down and he looked down to the ground and [said], [y]ou're going to find it anyway. . . . I asked him, [w]hat do you mean? And he says, [t]here's marijuana, but I don't know how much."

When the officer inquired as to where the marijuana was located, Warren responded, "It's in there, and he pointed at the top and he gave us the keys and we opened it, and sure enough that's what we found."

Warren's version of the events that evening contradicted those relayed by Officer Dupee. Warren denied giving the officers consent to search the vehicle. Warren testified that when Officer Galvan asked if he could look in his truck, Warren responded "Well, you're going to anyway." Warren was upset about the way Officer Galvan conducted the search—"He was tearing at the car I had sold. He tore the door panels off." He testified that the officers handcuffed him only after he complained about how Officer Galvan conducted the search. Warren further averred that Officer Dupee was lying about the beer can as well. "They're lying about that, and I wouldn't drink a Schlitz if it was the last beer on the planet."

The trial court denied the motion to suppress and Warren entered into a plea agreement with the State and was placed on six years deferred adjudication. This appeal ensued.

## MOTION TO SUPPRESS

### A.    Standard of Review

We review the trial court's denial of a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). A trial court's determination of historical facts is given almost total deference, while the trial court's application of the law is reviewed de novo. *Derichsweiler v. State*, 348 S.W.3d 906, 913 (Tex. Crim. App.

2011); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We "'afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor.'" *Montanez v. State*, 195 S.W.3d 101, 106 (Tex. Crim. App. 2006) (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *accord State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *see Valtierra*, 310 S.W.3d at 447; *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

## B.      Warrantless Searches

"The Fourth Amendment protects individuals against unreasonable searches and seizures." *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011). A search conducted pursuant to a defendant's voluntary, uncoerced consent is an exception to the Fourth Amendment's general prohibition on warrantless searches. *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012); *Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011); *Carmouche*, 10 S.W.3d at 331. "The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily." *Gutierrez v. State*, 221 S.W.3d 680, 686 (Tex. Crim. App. 2007); *accord Meekins*, 340 S.W.3d at 459; *Valtierra*, 310 S.W.3d at 448.

A trial court's finding of voluntary consent is reviewed for abuse of discretion, and "a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Meekins*, 340 S.W.3d at 460; *see Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007). Voluntariness is determined by analyzing "the totality of the circumstances of the situation from the point of view of an objectively reasonable person." *Tucker*, 369 S.W.3d at 185.

*1.     Arguments of the Parties*

Warren contends the State failed to introduce evidence of Warren's initial consent and, therefore, failed to meet its burden to show, by clear and convincing evidence, that the consent was voluntary.

The State counters the trial court's findings of fact and conclusions of law are supported by the evidence.  Although there was conflicting evidence, whether Warren provided consent is a question of fact and the trial court clearly chose to believe the officer's testimony over that of Warren.

*2.     Consent*

"A person's consent to search can be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent."  *Meekins*, 340 S.W.3d at 458.  For consent to be valid, it must "'not be coerced, by explicit or implicit means, by implied threat or covert force.'"  *Carmouche*, 10 S.W.3d at 331 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)).  Consent is not voluntary when the evidence establishes the consent was "'no more than acquiescence to a claim of lawful authority.'"  *Id*. (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

There is no requirement, however, that a person be informed of his right to refuse to consent before the consent can be held to be free and voluntary, *Schneckloth*, 412 U.S. at 227, and no magic words are required, *see United States v. Stewart*, 93 F.3d 189, 192 (5th Cir. 1996) (requiring magic words such as "I consent to a search" is inconsistent with the totality of the circumstances analysis).

*3.  Testimony and Findings of Fact and Conclusions of Law*

    a.    Officer Robert Dupee

The State's only witness was Officer Dupee.  Officer Dupee testified that based on the officers' suspicion that Warren might have been intoxicated, Officer Galvan conducted the HGN test.

> [W]e walked in back toward the front of our vehicle and between the truck and the trailer—between our car and the trailer, and we started—we asked him a number of questions from that point on, where is he coming from, how much he had to drink. We were monitoring his mannerisms to see if he had been too intoxicated to drive. . . . We asked him if we could search the vehicle and trailer. . . .  He said, Yes, go right ahead.

As he began conducting the search, Officer Galvan noticed something "peculiar" and signaled Officer Dupee to detain Warren.

Prior to placing the handcuffs on Warren, Officer Dupee specifically informed Warren that he was not under arrest.  "I'm just putting on your handcuffs; it doesn't mean you're under arrest; I'm just detaining you; my partner's seen something."  Officer Dupee continued that when Officer Galvan walked back toward the pickup truck, Warren's mannerisms completely changed

> "from being super nice and compliant to like upset and depressed. . . . His shoulders went down and he looked down to the ground and he says, [y]ou're going to find it anyway. . . .  I asked him, [w]hat do you mean? And he says, [t]here's marijuana, but I don't know how much."

The officers inquired as to where the marijuana was located and Warren replied, "It's in there, and he pointed at the top and he gave us the keys and we opened it, and sure enough that's what we found."

    b.    Charles Arthur Warren

The only other witness called during the motion to suppress was Warren.  According to Warren, Officer Galvan requested permission to search his truck and Warren responded "Well, you're going to anyway."  He testified he was upset about the way Galvan conducted the search

"He was tearing at the car I had sold. He tore the door panels off." Warren continued that he told the officers, "Don't be tearing up the car, and that's when I got in handcuffs."

Warren vehemently denied providing voluntary consent to either Officer Dupee or Officer Galvan.

c.    <u>Relevant Findings of Fact and Conclusions of Law</u>

Following the denial of Warren's motions to suppress, the trial court made the following relevant findings of fact:

> 9. The officers then asked if they could search the vehicle, and the defendant said, "Yes, go right ahead."
> . . .
> 15. [Warren] gave the officers the keys to the trailer.

In its conclusions of law, the trial court concluded the following:

> 4. [T]he defendant consented to the search of the vehicle.
> . . .
> 11. [T]he State has shown by clear and convincing evidence that the consent given by the defendant was freely and voluntarily given. It was not made as a result of duress nor did the defendant merely acquiesce to a show of authority by the officers.

*4.    Analysis*

Although Officer Dupee and Warren disagreed as to what transpired on the side of the highway, the trial court is the sole judge of the credibility of witnesses and weight to be given to their testimony. *See Ross*, 32 S.W.3d at 855; *McFadden v. State*, 283 S.W.3d 14, 19 (Tex. App.—San Antonio 2009, no pet.). It was within the trial court's sole discretion to accept or reject any or all of the witnesses' testimony, "even if that testimony is not controverted." *Ross*, 32 S.W.3d at 855; *accord McFadden*, 283 S.W.3d at 19.

Officer Dupee testified Warren voluntarily provided consent to search the vehicle. Warren testified he had no choice, and the officers were going to search the vehicle regardless of his consent. "[M]ost confrontations with the police are uncomfortable—given the implicit difficulty

- 7 -

in refusing any request from a peace officer who stands cloaked in the authority of law enforcement . . . ." *Carmouche*, 10 S.W.3d at 333. "But the Constitution does not guarantee freedom from discomfort." *State v. Velasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999). "[T]he Constitution presumes that an actor is invested with a vibrant sense of his own constitutional rights and will assert those rights when they are implicated." *Carmouche*, 10 S.W.3d at 333.

Faced with contradictory versions of events from Officer Dupee and Warren, the trial court clearly made the determination to believe Officer Dupee's testimony over Warren's testimony. The trial court was not required to accept Warren's suggestion that he believed he had no choice but to acquiesce to the search. Considering all of the circumstances, and giving proper deference to the trial court's findings of fact, we cannot say the trial court's determination that Warren voluntarily provided consent to search the vehicle is clearly erroneous. *See Meekins*, 340 S.W.3d at 460.

Accordingly, we overrule this issue. We turn to whether any consent was tainted by an unreasonably long detention.

## C.       Illegal Detention

### 1.       *Arguments of the Parties*

Warren contends that any consent given was tainted by the fact that it was requested after the detention continued for an unreasonable and unjustified length of time.

The State counters that Warren committed several traffic violations in front of the officers and the officers therefore had probable cause to arrest and further detain him.

### 2.       *Allowable Detention—Timeliness*

A police officer may stop a motorist without violating the Fourth Amendment if the officer has probable cause to believe that the motorist has committed a traffic violation. *See Whren v. United States*, 517 U.S. 806, 810 (1996); *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App.

2000). If an officer observes a traffic violation, probable cause for a traffic stop exists, and the officer is free to enforce the laws and detain the driver for the violation. *See* TEX. CODE CRIM. PROC. ANN. art. 14.01(b) (West 2015); *Boughton v. State*, 643 S.W.2d 147, 148 (Tex. App.—Fort Worth 1982, no pet.) (citing *Praska v. State*, 557 S.W.2d 83 (Tex. Crim. App. 1977)).

An officer may also briefly detain an individual for the purpose of investigating possibly-criminal behavior. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968); *Carmouche*, 10 S.W.3d at 328. We do not employ a bright line rule as to how long a traffic stop may reasonably continue; instead, courts consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *see United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc) ("There is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" (quoting *Sharpe*, 470 U.S. at 686)); *Kothe v. State*, 152 S.W.3d 54, 65 n.42 (Tex. Crim. App. 2004) (quoting *Brigham* for same).

To detain an individual for investigatory reasons, the officer must have "specific, articulable facts that, when combined with rational inferences from those facts, would lead [the officer] to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005) (citing *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)).

3.      *Testimony and Findings of Fact and Conclusions of Law*

Based on the conflicting testimony and the requirement the State provide "specific, articulable facts," we provide a more detailed description of the testimony.

a.        Officer Robert Dupee

Officer Dupee testified the officers initiated a traffic stop on Warren's truck based on three reasons: the license plate was not illuminated, his truck crossed the median into head-on traffic, and his truck crossed the double white line.  According to Officer Dupee, it was dark outside and the light on the trailer license plate was not on and the license plate could not be seen.  He continued that when the truck turned onto Loop 1604, "it went to the far right off the yellow line into the median and then went over the dotted line back across the same lane of travel, went back across over the dotted line and back over into the lane of travel he was supposed to be in."  When asked about crossing the median, Officer Dupee explained,

> [H]e went off into the median and then back across, across the dotted line—dotted white line, there was a vehicle.  And like I said, it's a two-lane road.  Another vehicle was coming and it looked like he was going to go head-on, but he was able to come back over into his lane of travel.

Officer Dupee authenticated pictures of the vehicle showing the license plate bungee-strapped to the back of the trailer without a light.

Because the officers knew the vehicle possibly contained a large shipment of narcotics, the officers cautiously approached the truck.  Officer Galvan approached the driver's side and Officer Dupee the passenger's side.  Officer Dupee, however, was adamant that he was able to hear the entire conversation that transpired between Warren and Officer Galvan.

Officer Dupee further testified that once the officers stopped the truck, they saw signs of intoxication.  Specifically, Officer Dupee testified to the odor of intoxicants, Warren's erratic driving, his bloodshot eyes, and a half-spilled can of beer in the truck.  Warren specifically denied having been drinking and explained that his eyes were bloodshot because of a medical condition.  He did, however, agree for Officer Galvan to conduct the HGN test.  As Officer Galvan conducted

the HGN test, the officers monitored Warren's behavior and mannerisms for further signs of intoxication.

According to Officer Dupee, it was at this point that Officer Galvan requested permission to search and Warren replied "Yes, go right ahead." Officer Galvan continued to ask Warren questions like, "where were you heading, stuff like that, looks like you're traveling a good distance. Mr. Warren was answering the questions, Oklahoma or something to that effect." It was when Officer Galvan walked between the trailer and the truck that he noticed something "peculiar" and Warren was placed in handcuffs to detain him during further investigation.

b.      Charles Arthur Warren

Warren adamantly disagreed with Officer Dupee's testimony. He insisted that he and the officers were standing in *front* of his truck, not between the truck and the officers' vehicle when Officer Galvan conducted the HGN test. Warren also claimed that Officer Galvan asked him to perform a one-leg stand test, but he was unable to complete the test due to his knee "giving out." Contrary to the officer's testimony, Warren continued that when Officer Galvan requested permission to search the vehicle, he responded "Well, you're going to anyway." Warren testified Officer Dupee lied about several events that night. First, he did not provide a voluntary consent to search the vehicle and there was no beer can in the truck. "They're lying about that, and I wouldn't drink a Schlitz if it was the last beer on the planet."

c.      Relevant Findings of Fact and Conclusions of Law

The trial court's findings of fact and conclusions of law were quite extensive. The findings of fact include the following:

> 2. [T]he license plate on the trailer was not illuminated. The failure to have the plate illuminated is a traffic violation.

3. [Warren's vehicle] went to the far right off the yellow line into the median and then went over the dotted line back across the same lane of travel . . . [and] nearly collide[d] with another vehicle . . . .

. . .

7. Officer Galvan noticed [Warren's] eyes were bloodshot and Officer Dupee noticed a can of beer and the smell of alcohol in the truck.

. . .

9. The officers then asked if they could search the vehicle, and the defendant said, "Yes, go right ahead."

. . .

11. Officer Dupee testified that Officer Galvan " . . . gave me a sign. And the sign is . . . to . . . handcuff the individual. He saw something that was peculiar."

12. At that point Officer Dupee placed handcuffs on [Warren]. Officer Dupee testified that he told [Warren] he was not under arrest but was being detained.

13. In response to Officer Galvan's question, "What's in there?" . . . [Warren said] "You're going to find it anyway."

14. Officer Dupee then asked [Warren] what he meant and [Warren] replied, "There's marijuana, but I don't know how much."

15. [Warren] gave the officers the keys to the trailer wherein they found large bundles of . . . marijuana.

16. The Court finds the testimony of Officer Dupee credible.

We also recite some of the trial court's conclusions of law:

2. In the instant case, the officers were notified that a white Ford F250 truck with a trailer was potentially transporting drugs and to be on the lookout for such a vehicle in the Loop 1604 area. Upon spotting a vehicle that matched the location and description, the officers noticed that the license plate light was not properly illuminated as required by Texas law, and furthermore they observed the vehicle swerving out of its lane of traffic, almost colliding with another vehicle. Upon pulling the truck over, the officers observed a can of beer in the cab of the truck and noticed that the defendant's eyes were red or bloodshot. Officer Dupee also saw large bundle plastic wrap which he suspected could be used to package drugs.

3. The defendant in this case was pulled over for many reasons, one of them being suspicion of DWI, another one for not having an illuminated license plate. Moreover in this case the officers never fully determined that the defendant was not driving under the influence. The testimony from Officer Dupee stated that Officer Galvan could not be certain whether the defendant

- 12 -

was under the influence. The investigation continued as the officers checked the defendant's license and talked with the defendant regarding the traffic violations he had committed. The defendant was being detained, but he was not under arrest. The officers monitored his mannerisms for evidence of intoxication. During that time frame, the defendant gave consent for the officers to search his vehicle.

4. Assuming, arguendo, that the suspicion of driving while intoxicated had been dispelled, the officers were still justified in their detention of the defendant regarding the traffic violations they observed the defendant commit and based on what they had seen in plain view. . . .

. . .

6. In the instant case, the officers had information from narcotics officers that a vehicle matching the location and description of the defendant's vehicle was thought or known to be carrying narcotics. The officers properly considered cumulative information during the investigative detention of the defendant. . . .

7. The officers witnessed the defendant's vehicle (which matched the description) commit two traffic violations. Upon stopping the vehicle, they noticed an open beer can in the cab of the truck, smelled alcohol, and observed the driver had blood shot or red eyes. They also saw plastic wrapping material in the back of the truck. Upon questioning the driver, he became upset or depressed. The court concludes that given the totality of the circumstances the officers had reasonable suspicion to believe an offense was being committed and therefore the detention is legal.

. . .

9. In the instant case, the officers' investigation of the defendant was not unnecessarily long or unreasonable. As the officers continued their investigation they became more suspicious that the defendant was involved in criminal activity. During the course of the ongoing investigation the defendant consented to the search of the vehicle."

### 4. Analysis

Because Warren contends the detention was an unreasonable and unjustified amount of time, we look at the officers' actions and basis for continued detaining of Warren.

The testimony before the trial court provided that Warren committed three different traffic violations in front of the officers: (1) failure to have a light illuminating his license plate, (2) failure to maintain a single lane, and (3) crossing over into the median. Although Warren disputes significant portions of Officer Dupee's testimony, the trial court is free to believe any, all, or none

of the witnesses. *See Ross*, 32 S.W.3d at 855; *McFadden*, 283 S.W.3d at 19. Because we are bound to provide the trial court's determination of historical facts almost total deference, we conclude that each of the alleged actions violated the Transportation Code and Officer Dupee had probable cause to stop the truck. *Derichsweiler*, 348 S.W.3d at 913; *Amador*, 221 S.W.3d at 673; *Carmouche*, 10 S.W.3d at 327.

Even after our determination that the stop was valid, we must consider whether the officers' continued detention exceeded a reasonable period of time. A police officer may approach a citizen without probable cause or reasonable suspicion to ask questions or even request a search. *Florida v. Royer*, 460 U.S. 491, 497–98 (1983); *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). Even when officers do not have articulable suspicion regarding criminal activity, the officers "'may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required.'" *Leach v. State*, 35 S.W.3d 232, 235 (Tex. App.—Austin 2000, no pet.) (alteration in original) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)).

After stopping the truck, Officer Dupee approached and he noticed a beer can in the front seat of the truck. Officer Galvan noted Warren had bloodshot eyes. Although Warren contends the bloodshot eyes were the result of a medical condition, the officers had probable cause, based on specific articulable facts to detain Warren for the purpose of determining whether he was intoxicated. Once the purpose of a traffic stop has been satisfied, the stop may not be used as a fishing expedition to discover unrelated criminal activity and that any continued detention must be supported by additional reasonable suspicion, *Davis v. State*, 947 S.W.2d 240, 245 (Tex. Crim. App. 1997). Although Warren testified differently, Officer Dupee testified that Warren gave consent to search.

The trial court could have reasonably believed that after exiting the truck, Warren provided officers with consent to search the vehicle. The trial court could have also reasonably found that Warren told the officers there was marijuana in the vehicle and provided the officers with the key. Based on the totality of the circumstances, we conclude that Warren's traffic stop and subsequent detention did not violate his Fourth Amendment rights and we cannot therefore conclude that the trial court erred in refusing to suppress evidence obtained pursuant to the search of the vehicle.

## CONCLUSION

The trial court is the sole judge of credibility and the weight to be given the witnesses' testimony. Clearly, in this case, the trial court chose to believe Officer Dupee's testimony over that of Warren. After reviewing the entire record, we conclude there was probable cause to initiate the traffic stop, Warren provided consent to search the vehicle, and the length of the detention was not unreasonable to conduct the investigation in question. Accordingly, we affirm the trial court's order denying Warren's motion to suppress.

Patricia O. Alvarez, Justice

PUBLISH